**In re SM 104 LIMITED, a Florida limited partnership, Debtor.**

**Bankruptcy No. 92–22698–BKC–AJC.**

United States Bankruptcy Court,
S.D. Florida,
Miami Division.

Sept. 15, 1993.

Reggie David Sanger, Fort Lauderdale, FL, for trustee.

Douglas E. Ernst, Troutman Sanders, Atlanta, GA, for EquiVest.

Chad P. Pugatch, Fort Lauderdale, FL, for debtor.

## AMENDED MEMORANDUM, OPINION AND ORDER

ROBERT E. GINSBERG, Bankruptcy Judge.[1]

This matter is before the court on the objections of EquiVest Inc., the successor to Realty South Investors, to the confirmation of the plan of the Debtor, SM 104 Limited. For the reasons stated below, the court denies confirmation.

## FACTS

The Debtor, SM 104 Limited, is a limited partnership which owns and operates an office complex called Cypress Creek Executive Court in Fort Lauderdale, Florida. The office complex is situated on land leased from the City of Fort Lauderdale. The Debtor acquired the leasehold in 1984 and, subsequently, built the office complex on it. Construction financing was provided by South Florida Savings Bank.

The Debtor is one of nine limited partnerships set up by William Murphy and Martin Sadkin. Each limited partnership was to own a single piece of commercial real estate.[2] SM Corporation is the general partner of each of the nine limited partnerships, including the Debtor. Sadkin withdrew from all of the limited partnerships and SM Corporation in January 1990. Since that time, Murphy has been the principal officer and sole owner of SM Corporation. The Debtor's limited partners are: (1) Murphy (59%); (2) Murvest, which is owned and controlled by Murphy and his brother (25%); and (3) Desert Oil, which is owned and controlled by Murphy's cousin, Kevin Murphy (15%). At the time the Chapter 11 petition was filed, the Debtor was managed by Douglas Management and Realty ("DM & R"), a corporation wholly owned by Murphy. The Debtor paid DM & R management fees, leasing commissions and fees for supervising tenant and capital improvements on the Cypress Creek property. In short, Murphy is the sole owner of both the Debtor's general partner and its prepetition management company. He is also the owner of the bulk of the limited partnership interests in the Debtor. Effectively, if not legally, Murphy could be equated with the Debtor.

In January 1987, at the Debtor's request, Callaway & Price, Inc. ("C & P") conducted an appraisal of the Cypress Creek property. C & P valued the property at $4.93 million as of January 1987, and at $5.525 million at "stabilization."[3] C & P estimated that the property would be stabilized by November 1987.

In June 1987, the Debtor borrowed approximately $4.8 million from Realty South Investors, Inc., the predecessor to EquiVest, Inc. ("EquiVest"). The loan was secured by a first mortgage on the Cypress Creek property and its rents, and a $100,000 letter of credit. The loan was guaranteed by both

---

1. United States Bankruptcy Judge, Northern District of Illinois, sitting by designation.

2. The Debtor is not the first of the nine SM limited partnerships to be unsuccessful. Another of the limited partnerships, SM 108, is also in bankruptcy. Two more of the limited partnerships, SM 103 and SM 107, were dissolved four years ago. The property owned by SM 102 was deeded back to the lender. Finally, SM 101, SM 106, and SM 109 all have liabilities in excess of their assets. Indeed, only SM 105 appears to have been successful, selling its office building for $23 million in 1990.

3. The appraisal defined stabilization as the point in time at which the property would reach a stabilized level of occupancy.

Murphy and Sadkin (up to $400,000 each).[4] The loan was for a term of five years, with interest at 9.75%, plus a contingent equity kicker. The Debtor used most of the proceeds of the EquiVest loan, $3.68 million, to take out South Florida Savings Bank's secured construction loan. It is not clear what happened to the remaining $861,000.[5]

In October 1987, the Debtor's principal leased tenant, Thasc Sales Company, leased one-third of the Cypress Creek property. Thasc is still the Debtor's major tenant, and continues to occupy one-third of the Cypress Creek property. Thasc's lease is currently at an above-market rent, and expires in September 1994.[6]

The Debtor's problems began almost immediately after the EquiVest loan was made. From the loan's inception in June 1987 through February 1989, the Debtor consistently failed to make its payments to EquiVest on time, and quickly fell four months behind in its payments. In March 1989, EquiVest restructured the loan in an attempt to help the Debtor make up the four monthly payments it was behind, but the Debtor's defaults continued. Between June 1987 and February 1989, EquiVest sent several letters notifying the Debtor of its defaults under the loan agreement. Finally, in January 1990, EquiVest brought a state court action against the Debtor, seeking to foreclose its lien against the Cypress Creek property.

On February 1, 1990, the state court entered an agreed lockbox order. That order provided for the establishment of a lockbox account to protect EquiVest's interest in the rents generated by the Debtor. The order provided that all rents generated by the Cypress Creek Property were to be deposited directly into the lockbox account. The Debtor was not to take any rents it collected. EquiVest was to take the monthly interest due it from the lockbox account, and remit the remainder of the rents back to the Debtor (actually to DM & R) to pay the necessary operating expenses of the property. On February 16, 1990, the Debtor and EquiVest entered into a settlement agreement dismissing the state court foreclosure case. Under the settlement agreement, the Debtor paid EquiVest almost all of the past-due interest it owed EquiVest.[7] While the agreement dismissed the state court action, it expressly stated that the lockbox order was to survive the dismissal, and that the court retained jurisdiction to enforce the agreement.

From February 1990 through July 1990, about $60,000 in rents were deposited into the lockbox account each month. In August 1990, however, only $25,000 was deposited into the lockbox. When Alfred Chambliss, then EquiVest's president, asked Murphy why the August deposits were lower than usual, Murphy told Chambliss that Thasc had withheld its rent because the roof was leaking. However, Murphy's statement to Chambliss was not true. Thasc had in fact paid its August 1990 rent.

The Debtor continued to divert Thasc's rental payments from the lockbox for most of the next year. On several occasions, Murphy told Chambliss that Thasc was not paying its rent due to Thasc's own financial problems. Again, Murphy's story was untrue. Thasc was paying its rent on time, and, on some occasions, even before it was due.

Finally, in September 1991, EquiVest filed a motion for a judgment of foreclosure in the state court action. On December 12, 1991, the court continued the motion for an evidentiary hearing, and ordered the Debtor to abide by the terms of the first lockbox order issued in February 1990. Nevertheless, the Debtor once again ignored the lockbox order, and continued to divert Thasc rent checks from the lockbox.

4. Although Sadkin withdrew from the limited partnerships and SM Corporation in January 1990, Sadkin's guaranty on EquiVest's loan to the Debtor was not released until December 8, 1992, the date of the state's court final judgment of foreclosure. *See* this section below.

5. At closing, the Debtor received about $761,000 in cash from EquiVest. In addition, about $100,000 temporarily was placed in escrow pending EquiVest's receipt of the letter of credit, but was released to the Debtor in July 1987.

6. Historically, the Cypress Creek property has remained at about 80–90% occupancy.

7. Apparently, the money used to pay the interest arrears came from a loan by Murphy to the Debtor.

208

Early in 1992, the Debtor stopped paying the rent due under its ground lease with Fort Lauderdale, its property taxes, and certain of its operating expenses. On March 9, 1992, the state court, responding to Equi-Vest's motion to appoint a receiver, appointed a Special Master for the purpose of overseeing and recommending payment of invoices for the operation and maintenance of the Cypress Creek property. After the appointment of the Special Master, EquiVest voluntarily agreed to fund certain operating expenses, such as the ground lease, from the lockbox.

In April 1992, the Debtor requested a loan from Riverside Capital Advisors to pay off EquiVest. The loan request package was prepared by Fred Welker, a mortgage banker and the Debtor's interest rate expert at the confirmation hearing in this case, and was titled "Douglas Management and Realty Co." The loan application claimed that the property had an appraised value of $6.7 million, according to the January 1987 C & P appraisal. The application provided that the Cypress Creek property cost $6.4 million to build. The loan request also represented the property's estimated net operating income before debt service to be $383,450.

All three of those pieces of information were false. C & P had valued the *entire fee* at $6.7 million, but had only valued the Debtor's *leasehold interest* at $4.93 million in January 1987 and at $5.525 million at "stabilization," which it projected would be in November 1987. In addition, the loan request package did not mention the fact that Equi-Vest had received an appraisal from its appraiser, Hume Real Estate Consultants, valuing the property at $3.07 million in December 1991. Although Murphy obtained a copy of the Hume appraisal sometime in the spring of 1992, he did not bring the appraisal to Riverside's attention. In addition, construction records and Murphy's testimony at the confirmation hearing make it clear that the actual cost of constructing the Cypress Creek property was only about $4 million. Finally, the $383,450 estimated net operating income was 26% higher than the net operating income forecast by the Debtor's own appraisal expert, Fred Roe, in June 1992.

Despite the March 1992 appointment of the Special Master, the Debtor continued to divert funds from the lockbox account. Thasc's May 1992 rent check was deposited in the bank account of one of the Debtor's affiliates (SM 109), and Thasc's June 1992 rent check was converted into a cashiers' check. In fact, between September 1990 and May 1992, only four of Thasc's twenty-one rent checks were actually deposited in the lockbox. The remainder were either deposited into the Debtor's unrestricted bank account, deposited into the bank accounts of other SM affiliates, or converted to cashiers' checks. These diversions took place despite EquiVest's numerous reminders of the Debtor's defaults; indeed, EquiVest sent the Debtor nine default notices between April 1991 and May 1992 alone. Finally, in late spring 1992, EquiVest moved to have the Debtor held in contempt for diversion of rent from the lockbox. A hearing on EquiVest's motion was scheduled for June 18, 1992.

At about this time, EquiVest apparently got word of the Hume appraisal to Riverside. In June 1992, Riverside offered to loan the Debtor's $2.3 million to pay off EquiVest, provided the Debtor could verify that its interest in the Cypress Creek property was worth $3.07 million. Riverside's terms for such a loan, however, were onerous. Riverside offered the Debtor a three year loan, at interest of 15% plus a 10–20% equity kicker. Riverside also demanded a consulting fee of $34,000. Despite Riverside's exorbitant terms, Murphy, desperate to save the property from foreclosure, apparently was willing to accept Riverside's loan offer. Murphy sent EquiVest a copy of Riverside's offer, along with a request that EquiVest accept $2.2 million in complete satisfaction of its loan to the Debtor. EquiVest declined to do so.

Also at about this time, the Debtor renegotiated its ground lease with the City of Fort Lauderdale. The negotiation lead to a reduction in the Debtor's lease payments to the city. As a condition of the lower lease payments, Fort Lauderdale required the Debtor to pay all rent arrearages ($38,000) and its

1991 property taxes, which were past due (approximately $99,000).[8]

On June 18, 1992, before the Debtor could pay the city's rent arrearages and past-due 1991 property taxes, on the morning the contempt hearing on the Debtor's diversion of rents was scheduled, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. On July 28, 1992, Marika Tolz was appointed Chapter 11 Trustee. Subsequently, the court approved the employment of Beverly Backhoff as the Trustee's accountant.

On August 3, 1992, the Debtor collected a past-due rent check from Bruce S. Butler, Inc., one of the Debtor's tenants. The check was in the form of a cashiers' check made payable to SM Corporation, the Debtor's general partner. Murphy deposited the check in the bank account of SM Corporation. He then wrote a check from SM Corporation to Michael Feinman, the Debtor's collection attorney, in the amount of the rent collected from Butler. The check to Feinman was dishonored for insufficient funds. About one month later, Backhoff, the Trustee's accountant, discovered that Murphy had collected the rent from Butler. Backhoff wrote Murphy to demand that Murphy forward the past-due Butler rent to the Trustee. Murphy did not respond. Backhoff would not back off, and continued to press the matter. Finally, on November 13, 1992, the morning the Debtor's examination by the Trustee at the § 341 creditors' meeting was scheduled, SM Corporation's check to Feinman was honored, and Feinman turned the rent over to the Trustee. *See* 11 U.S.C. § 341.

On September 18, 1992, the Debtor filed a proposed plan of reorganization. The Debtor amended that plan on November 14, 1992.[9]

The Debtor's plan divides the claims against the Debtor into 7 classes. Class 1 is EquiVest's disputed nonrecourse secured claim.[10] Class 2 is the claim of Capital Bank, which has a nonrecourse junior mortgage on the Cypress Creek property as a result of a loan it made to SM 108. Capital Bank's claim and mortgage is worthless, because the Cypress Creek property is fully encumbered by EquiVest's senior claim, leaving no equity for Capital Bank's mortgage, and Capital Bank's loan is nonrecourse. *See* 11 U.S.C. § 502(b); § 506(a); § 1111(b). Class 3 is EquiVest's unsecured deficiency claim.[11] Class 4 is the claim of Fort Lauderdale for rent arrearages and the past-due 1991 property taxes. That claim has been paid in full. Class 5 is the claims of the Debtor's trade creditors, totalling approximately $175,000. Class 6 is the unsecured claims of Murphy. Finally, Class 7 is the interests of the Debtor's equity security holders.

Basically, the Debtor's plan proposes to pay EquiVest's secured claim over 10 years, with interest at 8%, based on a twenty year amortization. The plan also proposes to pay Capital Bank's claim, EquiVest's unsecured deficiency claim, and the general unsecured claims a equal dividend on the effective date, with any balance owed to be paid in equal quarterly installments over the next two years. The plan does not provide for Class 4, which has already been paid in full. Furthermore, the plan waives the Class 6 inside claims. Finally, the plan proposes to wipe out, in effect, the existing equity interests. Under the plan, the equity interests in the reorganized Debtor will go to Murphy in exchange for a one time payment of $200,000 from Murphy to the Debtor on the effective date of the plan. Murphy intends to distrib-

---

**8.** Fort Lauderdale began billing the Debtor at the lower lease rate in August 1992.

**9.** Apparently due to a clerical mixup, the Debtor's amended plan was not docketed until August 13, 1993, when a duplicate original of the amended plan was filed. The failure to properly docket the Debtor's amended plan is of no moment in the confirmation process.

**10.** EquiVest's total claim is approximately $5.5 million. The portion of that claim which is se-

cured is disputed by the parties. *See* Section I below.

**11.** Although EquiVest's loan to the Debtor is nonrecourse, EquiVest is treated as a recourse lender under § 1111(b). *See* Section I below.

On February 24, 1993, EquiVest filed a notice in which it declared that, provided the Debtor's plan did not materially change, it did not wish to be treated as a fully secured creditor under § 1111(b). 11 U.S.C. § 1111(b).

ute the new equity interests to the old equity holders.[12]

Several significant changes in the Debtor's administration have been made by the Trustee. In November 1992, the Trustee, with court approval, entered into a property management agreement with Marstel Corporation, under which Marstel replaced DM & R as the manager of the Cypress Creek property. Since Marstel's appointment, the Trustee has collected approximately $60,000 per month in rents from the Cypress Creek property.

Also in November 1992, this court granted EquiVest relief from the automatic stay to set a sale date for its final judgment of foreclosure on the state court action. On December 7, 1992, EquiVest filed its own plan of reorganization.[13] On December 8, 1992, the state court entered a final judgment of foreclosure on EquiVest's loan to the Debtor. The final judgment released Murphy and Sadkin from their personal guaranties on the EquiVest loan.

On January 27, 1993, this court approved the Debtor's disclosure statement. The Debtor's plan was submitted to the various parties affected by the plan for a vote.[14]

On February 10, 1993, this court entered an agreed cash collateral order, providing, *inter alia*, that the Trustee could pay the rent arrearages and the past-due 1991 property taxes due to the City of Fort Lauderdale in connection with the lease renegotiation.[15] The cash collateral order also provided that, to the extent EquiVest's cash collateral was used to pay the rent arrearages and 1991 property taxes, EquiVest would be entitled to adequate protection payments at confirmation. Pursuant to the cash collateral order, the Trustee paid the prepetition rent arrearages and 1991 property taxes.

On February 26, 1993, the Debtor modified its amended plan of reorganization to increase the unsecured dividend being paid to the Class 2 claim of Capital Bank, EquiVest's Class 3 unsecured deficiency claim, and the Class 5 general unsecured creditors under the plan from 5% to 8.5%.

Ballots on the Debtor's plan were due by March 1, 1993. Class 1, EquiVest's secured claim, voted to reject the plan. Class 2, the claim of Capital Bank, originally voted to reject the plan, but, subsequent to the ballot deadline, was permitted to change its ballot to accept the plan. Class 3, EquiVest's unsecured deficiency claim, voted to reject the plan. Class 4, the City of Fort Lauderdale, is unimpaired by the plan, and, therefore, does not vote. *See* 11 U.S.C. § 1126(f). Class 5, the trade creditors' claims, voted to accept the plan. Classes 6 and 7, the claims of insider creditors and interests of existing equity holders, are wiped out by the plan and thus are deemed to reject it. *See* 11 U.S.C. § 1126(g).

On March 1, 1993, EquiVest filed its objections to the confirmation of the Debtor's plan. The court heard evidence with respect to the Debtor's plan and EquiVest's objections on March 8, 9, and 11, 1993. EquiVest's objections are now before the court for decision.

Currently, the Debtor has approximately $137,000 in cash available to pay administrative expenses, the unsecured dividend, and any adequate protection payments due EquiVest under the February 1993 cash collateral order. This includes about $73,000 collected by the Trustee from Murphy in settlement of the Trustee's preference actions against Murphy.

12. In actuality, the plan purports to allow the existing equity security holders to retain their equity interests. The word "retain" is misused in this context. Unless Murphy pays in $200,000, the old equity holders cannot get anything. Therefore, no "retention," as such, is possible. *See* Section II B below.

13. EquiVest's plan of reorganization was amended on January 8, 1993.

14. EquiVest has not asked this court to confirm its amended plan of reorganization in the prayer for relief in any of its pleadings in connection with the confirmation proceeding. Moreover, it is not clear whether EquiVest's plan of reorganization has ever been submitted to the Debtor's creditors for a vote. Therefore, EquiVest's plan is not before the court for confirmation.

15. The Trustee has assumed the modified lease with Fort Lauderdale. *See* 11 U.S.C. § 365.

## JURISDICTION AND PROCEDURE

This court has jurisdiction over this matter under 28 U.S.C. § 1334(b) as a matter arising under § 1129 of the Bankruptcy Code. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(L) as a proceeding involving the proposed confirmation of a plan and is before the court pursuant to the Standing Order of Reference of the United States District Court for the Southern District of Florida automatically referring bankruptcy cases and proceedings to this court for hearing and determination.

## DISCUSSION

### I. EquiVest's Claim.

There is no doubt that EquiVest's claim is undersecured. EquiVest's total claim is approximately $5.5 million. The parties agree that the value of EquiVest's collateral, the Cypress Creek property, does not exceed $2.7 million. Section 506(a) provides that an undersecured claim is to be bifurcated into two claims, secured and unsecured. Under § 506(a), EquiVest has a secured claim to the extent of the value of its collateral. 11 U.S.C. § 506(a). Thus, EquiVest has a secured claim to the extent of the value of the Cypress Creek property. The remainder of EquiVest's approximately $5.5 million claim is unsecured.[16] Obviously, the key to determining the nature and extent of EquiVest's secured and unsecured claims is to determine the value of the Cypress Creek property.

In determining the amount of an undersecured creditor's secured claim under § 506(a), property is to be valued "in light of the purpose of the valuation and of the proposed disposition or use of such property." 11 U.S.C. § 506(a). Where a debtor's plan proposes to retain and use the property, it is appropriate to value the property at its fair market value. *Matter of Savannah Gardens–Oaktree*, 146 B.R. 306, 310 (Bankr.

N.D.Ga.1992); *In re Usry*, 106 B.R. 759, 761 (Bankr.M.D.Ga.1989).

In this case, we have the usual battle of the appraisers. EquiVest's appraiser, John Danner, values the property at $2.7 million. The Debtor's appraiser, Fred Roe, values the property at $2.15 million. The higher value, of course, favors EquiVest by increasing the amount of its allowed secured claim under § 506. EquiVest's secured claim must be paid in full under the Code, while its unsecured deficiency claim need only be paid 8.5 cents on the dollar. *See* 11 U.S.C. § 1129(b). The lower value favors the Debtor by reducing the amount it must pay in full and increasing the amount it can settle for 8.5 cents per dollar. Thus, it is no surprise that each appraiser came up with a value more favorable to the interests of its client. It is left to the court to determine which appraisal is to be afforded greater weight.

Real estate appraisers typically use three methods to approximate the fair market value of property. The first method is the "income capitalization approach." *See generally* V. Brudney & A. Chirelstein, *Corporate Finance*, at 35–44 (2d ed. 1979). *See also In re Ascher*, 146 B.R. 764, 768 (Bankr.N.D.Ill. 1992) (applying the income capitalization approach); *Savannah Gardens–Oaktree*, 146 B.R. at 310 (same). This method gives recognition to the view that investors do not buy the bricks and mortar of a building. Rather, they buy the earnings the bricks and mortar will produce in the future. Measuring the fair market value of collateral under the income capitalization approach is a two-step analysis. First, the future net operating income of the property is estimated. Next, that income is divided by a capitalization rate ("capitalized") to obtain the fair market value of the property. Brudney & Chirelstein, at 42. *See also Ascher,* 146 B.R. at 768; *Savannah Gardens–Oaktree,* 146 B.R. at 310.[17]

---

**16.** The unsecured deficiency claim of a nonrecourse creditor, such as EquiVest, is afforded special status in a Chapter 11 pursuant to § 1111(b). *See* Section II A below.

**17.** Thus, the formula for valuation of a going concern is (1/capitalization rate) * net operating income. The first part of this formula, "1/capitalization rate," is often referred to as the "multi-

plier." This is because "1/capitalization rate" produces a number that is multiplied times the anticipated net operating income to give value. For example, assuming a capitalization rate of .125, the "multiplier" would be 8. Thus, the value of the property would be equal to its anticipated net operating income times 8.

The capitalization rate is computed by determining the annual rate of return a hypothetical investor would be looking for in deciding whether to buy the property. *See* R. Brealey & S. Myers, *Principles of Corporate Finance,* at 49, 192–99 (3d ed. 1988).[18] More specifically, the capitalization rate equals the risk-free interest rate available in the marketplace plus some risk premium the hypothetical investor would require to induce her to make the investment. Brealey & Myers, at 136–37; Brudney & Chirelstein, at 61–62 (quoting Lewellen, *The Cost of Capital* (1969)). The risk premium is determined by analyzing the risk involved in the business to be valued. Brealey & Myers, at 136–37; Brudney & Chirelstein, at 61–62 (quoting Lewellen, *The Cost of Capital* (1969)).

The second method used to determine the value of a business like that of the instant Debtor is the "comparable sales approach." Under that method, the appraiser researches the debtor's marketplace to find several recent sales of similar properties. Since every piece of property is unique, the appraiser then adjusts the actual sales prices of the comparables to account for both positive and negative differences between the comparables and the subject property. This process generates a range of adjusted sales and prices, within which the appraiser places the debtor's property in an attempt to ascertain what the debtor's property would actually sell for in its own market. *See* C.F. Sirmans, *Real Estate Finance,* at 132–37 (2d ed. 1989).

The final method is the replacement cost approach. This approach attempts to replicate the precise amount it would cost to reconstruct a piece of property of similar utility or usefulness as the subject property, applying currently used materials and building techniques, and factoring in actual and actuarial depreciation. *Id.* at 138. In effect, this method attempts to determine the actual present value of the debtor's bricks and mortar. This method is most useful in determining value for insurance purposes.

Roe, the Debtor's appraiser, valued the property in July 1992. Danner, EquiVest's

appraiser, valued the property in February 1993. Both Roe and Danner analyzed the value of the Cypress Creek property under all three standard methods. Their conclusions as to the value of the Cypress Creek property were not all that far apart. Roe concluded that the Cypress Creek property is worth $2.15 million, while Danner says it is worth $2.7 million. The difference between the valuations reached by the two appraisals stemmed from disagreement about the level of risk involved in running the Cypress Creek property. While Danner concluded that the Cypress Creek property is no riskier than any other similar commercial real estate property in the Fort Lauderdale area, Roe concluded that the property is significantly riskier than other similar properties in the Fort Lauderdale market. The primary basis for Roe's view of the risk associated with the Cypress Creek property is the fact that some ⅓ of the Debtor's space is occupied by a single tenant, Thasc. The Thasc lease is at an above-market rental. Unfortunately for the Debtor, the Thasc lease expires soon, and a new lease will have to be negotiated. In these negotiations, given the glut of office space available in South Florida and the Fort Lauderdale area, the Debtor will be at a significant disadvantage. Thus, in his analysis under the income capitalization approach, Roe chose to employ a much higher capitalization rate than Danner (13.5%, compared to the 10.5% used by Danner).

By the same token, Danner's analysis of comparable sales reached a higher value for the Cypress Creek property than Roe's analysis did. Roe and Danner strongly disagreed about what sales were comparable in terms of geography, the nature of the property and the business, and age.

Both Danner and Roe properly gave little weight to replacement value. Both recognized that the cost of rebuilding the Cypress Creek property is of, at best, limited relevance here. Indeed, if some disaster destroyed the Debtor's building, the appraisers' testimony suggests that, given the excess of available office space in South Florida, it

---

18. For a more detailed explanation of determining capitalization rates, *see* C.F. Sirmans, *Real* *Estate Finance,* at 146–50 (2nd ed. 1989).

would be fruitless to even rebuild the Cypress Creek property. Instead, a rational investor might well pocket the insurance proceeds and sell the leasehold for some other use. That option is not available to the Debtor; the Debtor's building is in fine condition. Therefore, both appraisers concluded that a rational investor would either hold the buildings to reap the rewards of the Debtor's future earnings or would offer it to the marketplace for sale, and thus emphasized the income capitalization and comparable sales approaches.

Unfortunately, neither appraisal is particularly persuasive. Danner's appraisal contains a number of careless errors that greatly affect the credibility of the appraisal. Furthermore, there is some risk that Danner was not a disinterested witness. He owns an office building within 2 miles of the Debtor's Cypress Creek property. Thus, there is at least some possibility that the shutdown of the Debtor could inure to his benefit. Consequently, the court is hesitant to give Danner's appraisal much weight. On the other hand, Roe appraised the property in July 1992, some eight months before the confirmation hearing. Thus, Roe's appraisal is weakened by its age. Interest rate conditions have changed in the past eight months, affecting the capitalization rate used by Roe in his income capitalization approach. Moreover, the sales comparables used by Roe are outdated, due to changes in interest rate conditions and the Fort Lauderdale area real estate market.

■ The court does, however, agree with Roe's view that the status of Thasc's lease makes the Cypress Creek property significantly riskier than other similar Fort Lauderdale commercial real estate properties. In addition, because of the admitted errors in Danner's appraisal and his possible conflict of interest, this court is left with little choice but to use Roe's appraisal. Moreover, because of the facts of this case, the court places primary reliance on the income capitalization approach Roe used to value the Debtor.[19]

■ Roe's appraisal, however, can only be relevant after it is brought up to date. Thus, it must be adjusted to give recognition for the significant reduction in risk-free interest rates over the past eight months. This adjustment is crucial. Under the income capitalization approach, the value of a commercial real estate property is computed by discounting its net cash flows by an appropriate capitalization rate. Where risk-free interest rates decrease, capitalization rates decrease, since capitalization rates are computed by taking the risk-free interest rates and adding a risk premium. Thus, other things being equal, when interest rates decrease, the values of all commercial real estate properties increase.

At the time of the appraisal, the risk-free rate used by Roe was 3.3%.[20] As of the date of the confirmation hearing, that same risk-free rate was approximately 3.15%. *See Treasury Bonds, Notes & Bills*, Wall St. J., March 15, 1993, at C16 (quoting September, 1993 treasury bill ask yield as of Friday, March 12, 1993). Adjusting Roe's $2.15 million valuation for this significant drop in interest rates, the court values the Cypress Creek property at $2.27 million.[21]

19. In other contexts, such as in the home real estate market, the comparable sales approach would be the best indicator of the value of property. The reason is that home values do not generate operating income, making the income capitalization approach useless. Moreover, it is generally recognized that identical houses in identical neighborhoods could be sold for identical prices.

20. Roe used the rate of return on six month treasury bills as the risk-free rate.

21. Although this value is computed using the income capitalization approach, it is consistent with the results reached by Roe, as well as Danner, under the comparable sales approach. Under that approach, Roe suggested a value of $2.2 million, while Danner suggested a value of $2.6 million ($3.55 million for the fee, minus $950,000 to adjust for the fact that the Debtor's interest is a leasehold). This is true even when Roe's older comparables are adjusted for the general reduction in interest rates between the confirmation hearing and Roe's appraisal. Moreover, the value is reasonably close to the replacement values suggested by both appraisals. Under that approach, Roe suggested a value of $2.2 million, while Danner suggested a value of $2.61 million ($3.56 million for the fee, minus $950,000 to adjust for the fact that Debtor's interest is a leasehold). The analysis under the replacement

Consequently, the value of EquiVest's collateral is $2.27 million. Under § 506(a), EquiVest's secured claim is fixed at that amount. EquiVest's unsecured claim is equal to the difference between its total claim of approximately $5.5 million and its secured claim, $3.23 million.

## II. EquiVest's Objections to Confirmation of the Debtor's Plan.

■ EquiVest objects to the confirmation of the Debtor's plan on five grounds. First, EquiVest alleges that the classification of its unsecured deficiency claim separately from other unsecured claims is impermissible under § 1122. Next, EquiVest claims that Murphy's purchase of the equity interest in the reorganized debtor violates the absolute priority rule contained in § 1129(b)(2)(B)(ii). Third, EquiVest argues that the treatment of its secured claim under the plan is not fair and equitable, in contravention of § 1129(b). Furthermore, EquiVest claims that the Debtor's plan is not feasible, in violation of § 1129(a)(11). Finally, EquiVest insists that the Debtor's plan was not filed in good faith, as required by § 1129(a)(3). It is the Debtor's burden to prove each of the requirements of confirmation by a preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

### A. May the Debtor separately classify EquiVest's unsecured deficiency claim created by § 1111(b) from the general unsecured claims?

EquiVest's initial objection to the Debtor's plan is that its separate classification of

---

cost approach would not have changed significantly between the confirmation hearing and Roe's appraisal, since the inflation rate has been low.

The income capitalization value is computed by dividing $302,875 (the stream of net operating income projected by Roe in perpetuity, which Danner agrees was basically accurate) by a 13.-35% capitalization rate. That capitalization rate is computed by: (1) determining the implicit risk premium in Roe's choice of 13.5% as the capitalization rate (which is 10.2%, based on a risk-free rate of 3.3% at the time of Roe's appraisal); and (2) adding that risk premium to the current risk-free rate of 3.15%.

EquiVest's unsecured deficiency claim from the claims of the general unsecured creditors is impermissible. EquiVest's argument in this regard is erroneous.

An attempt to force a Chapter 11 plan on one or more impaired classes of creditors that have rejected the plan is commonly referred to as "cramdown." *See generally* Kenneth Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code,* 53 Am.Bankr.L.J. 133 (1979). Section 1129(a)(10) of the Bankruptcy Code provides that before a plan can be crammed down over the objections of a creditor class, at least one impaired class of creditor claims must vote to accept the plan, without regard to any insider votes.[22] 11 U.S.C. § 1129(a)(10). Thus, the Debtor, to get its plan confirmed over EquiVest's objections, must come up with one impaired creditor class that accepts the plan, without regard to any insider votes in that class.

The Debtor has placed EquiVest's § 1111(b)—created deficiency claim in a separate class by itself, Class 3. This court has previously held EquiVest's unsecured claim is $3.23 million. The other unsecured creditors' claims are placed by the Debtor's plan in Class 5, and total $175,000. Given the size of EquiVest's § 1111(b) unsecured deficiency claim relative to the other unsecured claims and EquiVest's opposition to the plan, it is obvious the reason the Debtor seeks to separately classify EquiVest's § 1111(b) deficiency claim from the claims of other unsecured creditors is to satisfy the requirements of § 1129(a)(10); i.e., to get one impaired class to accept the plan.[23] EquiVest claims that

---

22. Even in a cramdown, the plan proponent must satisfy all of the elements of § 1129(a), except, of course, the requirement of § 1129(a)(8) that every impaired class must accept the plan. *See* 11 U.S.C. § 1129(a).

23. The Debtor has suggested no business justification for the separate classification of the Equi-Vest claim. It is also worth noting that the Debtor's plan offers EquiVest the same 8.5% dividend on its deficiency claim that it offers the general unsecured creditors. *See In re Bryson Properties XVIII,* 961 F.2d 496, 502 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992) (separate classification is "highly suspect" when separately classified claims are treated the same).

the Debtor's apparently manipulative motive is improper, and that EquiVest's unsecured deficiency claim should be placed in the same class as the claims of the general unsecured creditors. If the court accepts EquiVest's argument that it should be classified with the other general unsecured creditors in a single class and EquiVest's argument that the Class 5 unsecured creditors were the only impaired class to accept the plan, such a joint classification would be the death knell for the Debtor's plan because the Debtor could no longer satisfy the requirements of § 1129(a)(10). EquiVest's deficiency claim would be large enough to overwhelm the claims of the other members of that single class, and, by voting no, EquiVest could prevent the plan from being accepted by two-thirds in amount of the total unsecured claims. *See* 11 U.S.C. § 1126(c).

On the other hand, the Debtor claims that the validity of its plan's separate classification is moot, since Class 2, the claim of Capital Bank, is impaired and has accepted the plan. The Debtor also argues that even if Class 2 is not impaired, and the validity of the plan's separate classification is at issue, such separate classification, whether or not done solely to gerrymander to create an accepting impaired class, is perfectly consistent with the Bankruptcy Code.

### (1) Is Class 2 impaired?

Class 2 consists of a single creditor, Capital Bank, which holds a junior, nonrecourse mortgage against the Cypress Creek property. The Debtor argues that Class 2, which accepted the plan,[24] is an impaired class, and

thus any question about the separate classification of EquiVest's unsecured deficiency claim and the general unsecured claims is moot. Unfortunately for the Debtor, the Class 2 claim is not impaired.[25]

■ Section 1124 provides that a class of claims is impaired if, with respect to any claim in the class, the plan alters the "legal, equitable or contractual rights" to which such claim is entitled. 11 U.S.C. § 1124(1). Under § 1124, any alteration in a creditor's rights or privileges constitutes impairment. *In re Club Assocs.*, 107 B.R. 385, 401 (Bankr. N.D.Ga.1989), *appeal dismissed*, 956 F.2d 1065 (11th Cir.1992).

The basis of Capital Bank's Class 2 claim is a nonrecourse junior mortgage on the Cypress Creek property. Section 506(a) provides that "an allowed claim" is considered to be secured to the extent of the value of the creditor's interest in the collateral, and unsecured to the extent that the value of the creditor's claim exceeds that interest. Section 502(b)(1), however, provides that claims which are "unenforceable against the debtor and property of the debtor" are not allowable. 11 U.S.C. § 502(b)(1). Since Capital Bank's claim is nonrecourse, any unsecured claim it holds can only be allowed under § 502 to the extent § 1111(b) permits a nonrecourse lender to assert a deficiency claim against the estate. However, § 1111(b) is only available to those creditors who have a "claim secured by a lien on property of the estate." 11 U.S.C. § 1111(b)(1)(A).

■ Here, the court has already been determined that the value of the Cypress Creek

---

24. Because the court holds that Class 2 is not an impaired class, the court need not address EquiVest's claim that Capital Bank's ballot could not be changed after the ballot deadline.

25. The Debtor also contends that Class 4, the claim of the City of Fort Lauderdale, is an accepting impaired class. Fort Lauderdale's Class 4 claim arises out of a renegotiation of rent between the Debtor and the city. A group of the city's tenants in the Fort Lauderdale municipal airport area formed a tenants' association to try to negotiate rent reductions with the city. The city commission agreed to the Debtor's proposed rent reduction prior to the filing of the bankruptcy petition. Indeed, the city has been billing the Debtor at the lower rent since August 1992. The city's agreement was, however, conditional upon

the payment by the Debtor of all rent arrearages and the Debtor's past-due 1991 property taxes. The rent arrearages and 1991 real estate taxes were paid pursuant to the February 10, 1993 cash collateral order. The trustee has assumed the modified lease and agreement postpetition. *See* 11 U.S.C. § 365. Thus, while it is certainly true that Fort Lauderdale's rights were modified, they were not altered by the plan; rather, they were modified prepetition by agreement. The fact that the plan purports to incorporate the renegotiated agreement with Fort Lauderdale by reference is irrelevant. The plan merely confirms the prebankruptcy situation and in no way alters any rights the city has under the renegotiated lease. Therefore, the Class 4 claim of the city is not impaired. *See* 11 U.S.C. § 1124(1).

property is insufficient to satisfy EquiVest's first mortgage claim. *See* Section I above. Since Capital Bank's mortgage is junior to EquiVest's mortgage, it necessarily follows that the value of Capital Bank's interest in the property of the Debtor, and thus the amount of its secured claim and lien, is zero. *See* 11 U.S.C. § 506(a). Accordingly, Capital Bank does not hold a "claim secured by a lien on property of the estate" and does not have a § 1111(b) deficiency claim. *See* 11 U.S.C. § 1111(b)(1)(A). In addition, since the loan is nonrecourse, § 502(b)(1) prevents Capital Bank from maintaining any unsecured deficiency claim. Since Capital Bank has no right to payment from the Debtor or the Debtor's property, it is not a creditor of the Debtor. Since Capital Bank, the only member of Class 2, is not a creditor, Class 2 cannot be considered an "impaired class," or even a class. *See* 11 U.S.C. §§ 101(5), (10); § 102(2).[26] *See also* § 1122 (only claims or equity interests can be classified).[27] Consequently, Class 5, the general unsecured claims, is the only impaired class to accept the Debtor's plan.

(2) May a plan classify an unsecured deficiency claim created by § 1111(b) separately from other general unsecured claims? [28]

▮ In general, the proponent of a Chapter 11 plan has broad discretion to classify claims and interests in the plan according to the particular facts and circumstances of each case. *In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir.1990). The provision in Chapter 11 governing classification is § 1122, which provides:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
>
> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.[29]

11 U.S.C. § 1122.

▮ Section 1122(a) expressly provides that only substantially similar claims may be placed in the same class. It does not expressly require that all substantially similar claims be placed in the same class, nor does it expressly prohibit substantially similar claims from being classified separately. *See In re Bryson Properties XVIII*, 961 F.2d 496, 502 (4th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992). Nevertheless, many courts, including five circuit courts of appeal, while recognizing that § 1122 does not explicitly forbid a plan proponent from placing similar claims in separate classes, have imposed significant limits on the ability of a plan proponent to do so. *See, e.g., Hancock Mutual Life Insur. Co. v. Route 37 Business Park Assoc.*, 987 F.2d 154, 159–60 (3d Cir.1993); *In re Lumber Exchange Bldg. Ltd.*, 968 F.2d 647, 649 (8th Cir.1992); *Bryson Properties*, 961 F.2d at 502; *Matter of Greystone III Joint Venture*, 995 F.2d 1274, 1278–1279 (5th Cir.1991); *In re U.S. Truck Co.*, 800 F.2d 581, 586 (6th Cir.1986). *See also Holywell Corp.*, 913 F.2d at 880.[30] The majority of lower courts have

---

26. The Debtor's plan contemplates a distribution to Capital Bank, which is not a creditor or equity owner. This amounts to a gift, which is a per se violation of the absolute priority rule, and makes the Debtor's plan unconfirmable. *See* 11 U.S.C. § 1129(b).

27. There is no suggestion that Capital Bank is an equity owner.

28. This section considers only the propriety of the separate classification of unsecured deficiency claims of nonrecourse creditors, which are created by § 1111(b). The court does not consider the propriety of separate classification of the unsecured deficiency claims of recourse creditors, which are created by contract.

29. The Debtor's plan does not have a class of small, general unsecured claimholders segregated out from the larger general unsecured creditors for purposes of administrative convenience.

30. In *Holywell*, the Eleventh Circuit did not consider whether unsecured deficiency claims and other unsecured claims were substantially similar. *Holywell*, 913 F.2d at 880. Indeed, the court believes that the *Holywell* decision is confined to its very unusual facts.

followed suit.[31]

In *Greystone*, the Fifth Circuit held that "one clear rule" has emerged from the otherwise muddled § 1122 caselaw: "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Greystone*, 995 F.2d at 1279. The court reasoned that if § 1122(a) were wholly permissive regarding the formation of different classes from similar types of claims, there would be no need for § 1122(b) to authorize a class of smaller, unsecured claims. The *Greystone* court then held that a broad interpretation of the powers to classify similar claims separately under § 1122(a) "would render § 1122(b) superfluous, a result that is anathema to elementary principles of statutory construction." *Id.* at 1278. Consequently, the *Greystone* court held that § 1122 must contemplate some limits on classification of claims of similar rights. *Id.*

However, while *Greystone* and the other cases have paid lip service to principles of statutory construction and the language of § 1122, they have turned more on notions of basic fairness and good faith. Indeed, most courts seem to base their rulings less on the language of § 1122 than on their view that separate classification is usually done to manipulate the voting to insure that at least one impaired class of creditors accepts the plan, and thus that the plan meets the requirements of § 1129(a)(10).[32] *See In re ZRM–Okla. Partnership*, 156 B.R. 67, 70 (Bankr. W.D.Okla.1993) (calling the "unspoken belief" underlying the *Greystone* line of cases "disconcerting"). Such manipulation is viewed as some sort of "abuse" of Chapter 11. As the Eleventh Circuit noted, "[t]here must be some limit on a debtor's power to classify

creditors ... The potential for abuse would be significant otherwise." *Holywell*, 913 F.2d at 880. *See also Route 37*, 987 F.2d at 158; *Lumber Exchange*, 968 F.2d at 650; *Bryson Properties*, 961 F.2d at 502; *Greystone*, 995 F.2d at 1279; *U.S. Truck*, 800 F.2d at 586. Courts subscribing to this view have rejected any plan where the classification scheme "is designed to manipulate class voting, or violates basic priority rights." *Holywell Corp.*, 913 F.2d at 880; *U.S. Truck*, 800 F.2d at 586. *See also In re Johnston*, 140 B.R. 526, 529 (9th Cir.B.A.P.1992). Under such an analysis, the courts in *Route 37*, *Lumber Exchange*, *Bryson*, and *Greystone* have held that separate classification of an unsecured deficiency claim created by § 1111(b) from general unsecured claims solely to gerrymander to create impaired accepting creditor class (i.e. the general unsecured creditors) is impermissible. *Route 37*, 987 F.2d at 161; *Lumber Exchange*, 968 F.2d at 650; *Bryson*, 961 F.2d at 502; *Greystone*, 995 F.2d at 1279.

Obviously, one premise for the rulings in *Route 37*, *Lumber Exchange*, *Bryson*, and *Greystone* has been that unsecured deficiency claims created by § 1111(b) are substantially similar to general unsecured claims. *See Route 37*, 987 F.2d at 161; *Lumber Exchange*, 968 F.2d at 650; *Bryson*, 961 F.2d at 502; *Greystone*, 995 F.2d at 1279–1280. Indeed, if the claims are not substantially similar, § 1122(a) would bar them from being put in the same class. 11 U.S.C. § 1122(a). However, a few lower courts have rejected this conclusion and held that unsecured deficiency claims created by § 1111(b) are not substantially similar to other unsecured claims, and thus that separate classification of those claims is not only permissible, but

---

**31.** *See, e.g., In the Matter of Boston Post Road Ltd. Partnership*, 154 B.R. 617 (D.Conn.1993); *In Re Austin Ocala Ltd.*, 152 B.R. 773 (Bankr. M.D.Fla.1993); *In re Roswell–Hannover Joint Venture*, 149 B.R. 1014 (Bankr.N.D.Ga.1992); *In re 266 Washington Associates*, 147 B.R. 827 (E.D.N.Y.1992); *In re Main Road Properties, Inc.*, 144 B.R. 217 (Bankr.D.R.I.1992); *In re L.G. Salem Ltd. Partnership*, 140 B.R. 932 (Bankr. D.Mass.1992); *In re Cantonwood Associates Ltd. Partnership*, 138 B.R. 648 (Bankr.D.Mass.1992); *Piedmont Associates v. Cigna Property & Casualty Insurance*, 132 B.R. 75 (N.D.Ga.1991); *In re Valrico Square Limited Partnership*, 113 B.R. 794

(Bankr.S.D.Fla.1990); *In re Waterways Barge Partnership*, 104 B.R. 776 (Bankr.N.D.Miss. 1989); *In re Meadow Glen, Ltd.*, 87 B.R. 421 (Bankr.W.D.Tex.1988).

**32.** In fact, *Greystone* directly stated that separate classification was proper if "for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class." *Greystone*, 995 F.2d at 1279. Indeed, separate classification for valid business reasons is uniformly accepted. *See, e.g., In re Johnston*, 140 B.R. 526, 529 (9th Cir.B.A.P.1992); *Piedmont Assocs.*, 132 B.R. at 78; *Club Assocs.*, 107 B.R. at 401.

mandatory. *See* 11 U.S.C. § 1122(a) (only substantially similar claims may be placed in the same class). *See In re D & W Realty Corp.*, 156 B.R. 140, 144 (Bankr.S.D.N.Y. 1993).; *ZRM-Okla.*, 156 B.R. at 70; *In re Creekside Landing, Ltd.*, 140 B.R. 713, 715 (Bankr.M.D.Tenn.1992); *In re Bjolmes Realty Trust*, 134 B.R. 1000, 1003 (Bankr.D.Mass. 1991); *In re Aztec Co.*, 107 B.R. 585, 587 (Bankr.M.D.Tenn.1989).[33]

These latter courts rely on two lines of reasoning to support their conclusion.[34] First, some of these courts believe that general unsecured claims and unsecured deficiency claims created by § 1111(b) are legally distinct because the former are recourse claims cognizable under state law, while the latter exist only within the Chapter 11 bankruptcy case and are not cognizable under state law. *See, e.g., Aztec*, 107 B.R. at 587; *Bjolmes*, 134 B.R. at 1003. The circuit courts have largely rejected this argument, holding that § 1111(b) has largely eliminated the legal distinction between non-recourse deficiency claims for purposes of Chapter 11. *See Route 37*, 987 F.2d at 161; *Lumber Exchange*, 968 F.2d at 649; *Greystone*, 995 F.2d at 1279–1280.

In addition, the minority of courts supporting the proposition that the separate classification of unsecured deficiency claims created by § 1111(b) is either proper or required often argue that separate classification is permissible on the grounds that the vote of such claims will be uniquely affected by the plan's proposed treatment of the secured claim held by the creditor. Thus, for example, the court in *Aztec* reasoned that the undersecured mortgagee would have "every incentive to vote its large deficiency claim to affect the treatment of its secured claim by defeating confirmation of any plan" if classified with other unsecured creditors. *Aztec*,

107 B.R. at 587. *See also Bjolmes*, 134 B.R. at 1003; *In re Triple R Holdings, L.P.*, 134 B.R. 382, 387 (Bankr.N.D.Cal.), *rev'd on other grounds*, 145 B.R. 57 (N.D.Cal.1992). Such a rationale is highly persuasive when viewed in light of the logic underlying § 1129(a)(10). Section 1129(a)(10) was intended not to give the real estate lobby a veto power, but merely to require "some indicia of creditor support" for confirmation of a proposed Chapter 11 plan. *See In re Polytherm Indus., Inc.*, 33 B.R. 823, 835 (W.D.Wisc.1983); P. Murphy, *Creditors' Rights In Bankruptcy*, § 16.11, 16–20 (1980); R. Haines, *Cramdown*, 2 Norton Bankr.Law Adviser, at 4 (1990).[35]

Among the circuits considering the separate classification of unsecured deficiency claims created by § 1111(b), only the *Route 37* court has considered the voting incentive rationale, rejecting it. *Route 37*, 987 F.2d at 161–62. *But see U.S. Truck*, 800 F.2d at 587 (union separately classified from other unsecured creditors because its vote might be affected by a noncreditor interest in the ongoing employment relationship). The *Route 37* court reasoned that "absent bad faith or illegality . . ., the Code is not concerned with a claim holder's reason for voting one way or another . . . [and that] undoubtedly, most claim holders vote in accordance with their overall economic interests," not simply their creditor interests. *Route 37*, 987 F.2d at 161–62.

■ Fortunately, this court does not have to sort out the validity of the various lines of reasoning enunciated by those courts considering separate classification of unsecured deficiency claims created by § 1111(b). Instead, this court believes that the lines of reasoning articulated by the circuit courts and the majority of district and bankruptcy

---

**33.** Because this court holds below that an unsecured deficiency claim created by § 1111(b) is not substantially similar to other general unsecured claims, this court need not address whether separate classification of substantially similar claims solely to gerrymander an accepting impaired class is permissible under the Code.

**34.** One recent case has taken a third, simpler route to the same result. *See ZRM–Okla.*, 156 B.R. 67. In *ZRM*, the court was highly critical of

the four circuit decisions prohibiting separate classification, and held that separate classification of unsecured deficiency claims and unsecured trade claims was entirely permissible under the plain language of the Code. *Id.*, 156 B.R. at 70.

**35.** While such a view is quite persuasive, the court does not rely upon it in making its decision. Rather, the court relies upon the reasoning enunciated below.

courts have missed the forests for the trees. Section 1122(a) allows joint classification of claims *only* if the claims are substantially similar in terms of their legal rights. There are, however, significant differences between the legal rights of a general unsecured claim and an unsecured deficiency claim created for the nonrecourse lender by § 1111(b). Thus, an unsecured deficiency claim created by § 1111(b) is not substantially similar to general unsecured claims, and, under § 1122(a), the two types of claims *cannot* be classified together.

The most obvious difference between a general unsecured claim and an unsecured deficiency claim created by § 1111(b) is that the former exists regardless of what chapter of the Bankruptcy Code the case is in, while the latter exists only so long as the case remains in Chapter 11. *See* 11 U.S.C. § 103(f). If the Chapter 11 case is converted to Chapter 7, the nonrecourse lender is confined to its collateral for recovery. It has no deficiency claim against the Chapter 7 estate. *See* 11 U.S.C. § 502(b)(1). This distinction is significant.

One area in which the distinction between the rights of holders of general unsecured claims and the rights of § 1111(b) deficiency claimants can be seen clearly is in the application of the "best interests" test of § 1129(a)(7). *See* 11 U.S.C. § 1129(a)(7). Section 1129(a)(7) sets out the financial minimum that assenting creditors in an assenting class can impose on dissenting creditors within that class. This minimum was drawn from the best interests test that came to the Bankruptcy Code from the old Chapter XI. *See* Bankruptcy Act of 1898, § 366(2) (repealed 1979); H.R.Rep. No. 595, 95th Cong., 1st Sess. 412–13 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Section 1129(a)(7) provides that, with respect to every impaired class, each holder of a claim or interest of such class:

 (i) has accepted the plan; or

 (ii) will receive or retain under the plan on account of such claim or interest proper-

ty of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date ...

11 U.S.C. § 1129(a)(7).

Thus, the majority in a class can never force the minority in that class to take less in present value terms than the minority would receive in a Chapter 7 liquidation case involving the debtor.

The application of this standard to a class consisting of both general unsecured claims and § 1111(b) deficiency claims can lead to anomalous results. A simple example shows why. Suppose that an unsecured deficiency claim created by § 1111(b) is placed in the same class as the general unsecured claims, and that the plan provides for that class to receive a 25% payment of claims on the effective date of the plan. Suppose further that, in a Chapter 7 liquidation, the holders of general unsecured claims would be paid a 35% dividend. The plan would fail the best interests of the creditors test as to the general unsecured creditors, and the plan could not be confirmed unless each general unsecured claim voted for the plan. *See* 11 U.S.C. § 1129(a)(7). This would be true even if a majority in number and two-thirds in amount of the claims in the class that voted on the plan voted to accept. *See* 11 U.S.C. § 1126(c). On the other hand, the plan would propose to give the unsecured deficiency claim created by § 1111(b) more than it would receive in a hypothetical Chapter 7 liquidation: in a Chapter 7 case, the unsecured deficiency claim created by § 1111(b) would not exist and would not be paid at all.

All that is ever required to satisfy the best interests test as to a § 1111(b) nonrecourse deficiency claim is for the claimholder to receive the present value of the collateral.[36] Nevertheless, as long as joint classification is utilized, the holder of a § 1111(b) deficiency

---

**36.** This result is made clear by § 1129(a)(7)(B), which provides that "if section 1111(b)(2) of this title applies to the claims of [a] class, each holder of a claim of such class [must] receive or retain under the plan on account of such claim proper-

ty of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims." 11 U.S.C. § 1129(a)(7)(B).

claim can hold out for a dividend equal to what the general unsecured claims are being paid to satisfy the best interests of the creditors test as to such creditors, even though the undersecured nonrecourse claim is never entitled to any payment in a Chapter 7 case for the amount by which the value of its collateral is less than it is owed. This is because § 1123(a)(4) requires a plan to provide for the same treatment of all claims in a class, unless the holder of a claim agrees to less favorable treatment. 11 U.S.C. § 1123(a)(4). Thus, in the hypothetical above, if the plan were amended to satisfy the best interests of the creditors test by giving the holders of general unsecured claims a 35% dividend, the holder of the § 1111(b) nonrecourse deficiency claim could, as long as the claims are jointly classified, insist on the same 35% dividend, or block confirmation of the plan. It would be hard to believe that the drafters of the Bankruptcy Code intended such an absurd result.

There are other significant disparities between the legal rights of the holder of a general unsecured claim and the holder of a § 1111(b) nonrecourse deficiency claim. For example, if the debtor is a partnership, the general partners are liable for the debts of the partnership in the event the case converts to one under Chapter 7. *See* 11 U.S.C. § 723. If the Chapter 11 case shows signs of possible failure, the general unsecured creditors could seek equitable relief to prevent dissipation of the assets of the general partners pending resolution of the Chapter 11 case. It is unlikely that the holder of a § 1111(b) nonrecourse deficiency claim could pursue such relief, since the nonrecourse lender is confined to its collateral as a source of payment in Chapter 7. It has no deficiency claim against either the estate or the general partners. *Aztec,* 107 B.R. at 591; Randall Klein, *A Reply to Whether § 1111(b) Gives General Partners Exposure on Nonrecourse Debt,* 7 Norton Bankr.Law Adviser (July 1993). *But see* Craig H. Averch and Michael J. Collins, *Bankruptcy Code § 1111(b) and Its Impact on Financial Obligations of Nondebtor General Partners of Partnership That Is Debtor Under Chapter 11,* 5 Norton Bankr.Law Adviser (May 1993).

It is clear that the legal rights of creditors holding unsecured deficiency claims created by § 1111(b) and general unsecured creditors are, for classification purposes, substantially dissimilar. Therefore, separate classification of unsecured deficiency claims created by § 1111(b) and general unsecured claims is not only permissible, but mandatory. *See* 11 U.S.C. § 1122(a).

The conclusion that an unsecured deficiency claim created by § 1111(b) cannot be placed in the same class with general unsecured claims is further supported by the language of § 1111(b) itself. In fact, the plain meaning of § 1111(b) clearly leads to the conclusion that the § 1111(b) claim must be placed in a class by itself or with only other § 1111(b) claims. *See generally Dewsnup v. Timm,* —— U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) (Scalia, J., dissenting). The drafters of the Bankruptcy Code provided that the § 1111(b)(2) election is to be made not by the individual § 1111(b) claimants, but by "the class of which such claim is a part...." *See* 11 U.S.C. § 1111(b)(1)(A)(i). *See also* Fed.R.Bankr.P. 3014. If the § 1111(b) claim is placed in the same class as general unsecured claims, the literal language of the statute would afford the general unsecured creditors the opportunity to vote on whether their classmate, the § 1111(b) claimholder, should be permitted to make the § 1111(b)(2) election. *See D & W Realty,* 156 B.R. 140, 144. In fact, the general unsecured creditors could easily block the § 1111(b)(2) election by denying the § 1111(b) creditor the approval of the election by a majority in number of claim holders in the class required by § 1111. *See* 11 U.S.C. § 1111(b)(1)(A)(i). Obviously, the drafters of the Bankruptcy Code did not intend such an absurd result. *See* 124 Cong. Rec.H. 11103–05 (daily ed. Sept. 28, 1978); S. 17420–22 (daily ed. Oct. 6, 1978). More importantly, the § 1111(b) election process makes perfect sense if § 1111(b) is read to require that an § 1111(b) unsecured deficiency claim must be placed either in a class by itself or in a class with only other § 1111(b) claims.

By the same token, § 1111(b)(1)(B) denies the right to make the election to "[a] class of

claims" if, *inter alia*, the lien claims of the members of the class are of "inconsequential value." By definition, the general unsecured creditors have no lien claims. If the analysis is on a class-wide basis, as the statute clearly mandates, and the § 1111(b) claim and the general unsecured claims are placed in a single class, the general unsecured creditors theoretically could ride the § 1111(b) claimholder's coattails and participate in the § 1111(b) election process, since the collateral held by all of the members of the class collectively is not of inconsequential value. Again, such an absurd result can be avoided by simply reading § 1111(b) as its plain meaning provides; that is, by reading § 1111(b) to require that a § 1111(b) claim be placed in a class by itself or in a class with only other § 1111(b) claims.

Thus, this court rules that the Debtor's separate classification of EquiVest's Class 3 unsecured deficiency claim and the claims of the Class 5 general unsecured creditors is permissible. Indeed, such separate classification is required by § 1122(a). *See* 11 U.S.C. § 1122(a). Since separate classification is required by § 1122(a), the Debtor's motive in separately classifying the § 1111(b) claim and the general unsecured claims is irrelevant.

B. Does the purchase of the equity interests in the reorganized debtor by its prepetition equity holders for $200,000 violate the absolute priority rule?

 EquiVest's second objection to the Debtor's plan is that the Debtor's prepetition equity holders are permitted to purchase full ownership of the reorganized debtor for $200,000. EquiVest claims that such a purchase violates the absolute priority rule, since the Debtor's unsecured creditors are not paid in full but the Debtor's prepetition equity holders wind up owning the reorganized debtor. *See* 11 U.S.C. § 1129(b)(2)(B)(ii). The Debtor argues, however, that the prepetition owners' purchase is permissible under the so-called "new value exception." This court considers the phrase

"new value exception" to be an unfortunate misnomer. As long as certain requirements are met, purchase of the equity of the reorganized debtor by the debtor's prepetition equity holders is entirely consistent with the absolute priority rule. In this case, those requirements are met. Thus, the Debtor's prepetition owners' purchase of the equity interests in the reorganized Debtor under the Debtor's plan is perfectly acceptable.

### (1) The absolute priority rule and *Case v. Los Angeles Lumber.*

The absolute priority rule has long been a fundamental tenet of bankruptcy law, tracing back at least to the Supreme Court's ruling in *Northern Pacific Ry. Co. v. Boyd*, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913). Section 77(b) of the Bankruptcy Act of 1898, the statute governing the *Boyd* case, required that a plan of reorganization be "fair and equitable." In *Boyd*, the court held that the phrase "fair and equitable" meant that for a reorganization plan to be able to receive judicial approval, each senior class of claims or interests had to be fully satisfied before any junior class of claims or interests could participate in the reorganization. *Boyd*, 228 U.S. at 504–05, 33 S.Ct. at 560. The rule enunciated in *Boyd* quickly became known as the absolute priority rule.

Subsequently, in *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 121–22, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939), the Supreme Court appeared to create what has become commonly known as the "new value exception" to the absolute priority rule. In *Los Angeles Lumber*, the Court considered whether a plan of reorganization that gave prepetition equity holders an equity stake in the reorganized debtor without requiring a fresh contribution of capital [37] and did not pay creditors in full was "fair and equitable" under § 77B of the 1898 Act. Such a plan obviously violated the absolute priority rule enunciated in *Boyd*, and the court so held. However, in *Los Angeles Lumber*, the Court went on to spell out circumstances under

---

**37.** In *Los Angeles Lumber*, the plan proposed to give the debtor's prepetition owners 23% of the equity in the reorganized debtor in exchange for their promise to manage the debtor; i.e., their

"familiarity with the business" and the benefit of their "financial standing and influence in the community." *Id.* 308 U.S. at 112–13, 60 S.Ct. at 6.

which prepetition equity holders may participate in a plan of reorganization even though not all creditors of the debtor are paid in full under the reorganization plan. The Court stated that participation by prepetition owners without full payment to creditors would not violate the absolute priority rule if: (1) the prepetition owners made a fresh contribution; (2) in money or money's worth; (3) that was reasonably equivalent to the participation accorded those owners; and (4) that was necessary for an feasible reorganization. *Los Angeles Lumber,* 308 U.S. at 121–22, 60 S.Ct. at 10. *See also Kansas City Terminal Ry. Co. v. Central Union Trust Co.,* 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926) (stating simply that prepetition owners might participate in reorganizations in certain circumstances).

Although the court's statement about equity participation in *Los Angeles Lumber* was dictum,[38] most lower courts have read *Los Angeles Lumber* as establishing a "new value exception" to the absolute priority rule. *See, e.g., First Nat'l Bank of Herkimer v. Poland Union,* 109 F.2d 54, 56 (2d Cir.), *cert. denied,* 309 U.S. 682, 60 S.Ct. 723, 84 L.Ed. 1026 (1940); *In re Universal Lubricating Systems, Inc.,* 71 F.Supp. 775 (W.D.Pa.1947); *In re Muskegon Motor Specialties,* 366 F.2d 522 (6th Cir.1966).

In 1978, Congress enacted the Bankruptcy Reform Act, creating a new Bankruptcy Code to replace the Bankruptcy Act of 1898. *See* 11 U.S.C. § 101, *et seq.* The Bankruptcy Code was a comprehensive revision of the law under the 1898 Act. Dramatic changes were made in business reorganization cases. The three reorganization chapters of the 1898 Bankruptcy Act, Chapter X (large business reorganizations), Chapter XI (small business arrangements), and Chapter XII (real estate reorganizations), were combined in a single reorganization chapter, Chapter 11.

Under Chapter 11, if a plan of reorganization is approved by each and every class of

creditors and owners whose claims or interests are impaired by the plan, the absolute priority rule does not apply. Instead, prepetition equity can retain its equity even if creditors are not paid in full so long as each class of creditors receives payment of a value at least equal to what those creditors could have expected to receive had the debtor opted for a Chapter 7 liquidation instead of a Chapter 11 reorganization. *See* 11 U.S.C. §§ 1126, 1129(a).[39] The absolute priority rule comes into play in a reorganization case under Chapter 11 of the Bankruptcy Code only if one or more classes of creditors or equity holders impaired by the plan rejects the plan, and the plan proponent nevertheless seeks to have the plan confirmed over the objection of the rejecting class or classes. *See* 11 U.S.C. § 1129(b)(2)(B)(ii).

Although the Bankruptcy Code codified the judicially created absolute priority rule, it did not expressly codify the *Los Angeles Lumber* dictum. Incredibly, in the voluminous legislative history of the Code, the "new value exception" is virtually unmentioned. *See, e.g.,* H.R.Rep. No. 595, 95th Cong., 1st Sess. at 413–18 (1988); 124 Cong.Rec. H11103–05 (daily ed. Sept. 28, 1978) and S17420–22 (daily ed. October 6, 1978) (testimony of Rep. Edwards and Sen. DeConcini). Indeed, only the Bankruptcy Commission's report to Congress, which, at best, could be considered the earliest part of the legislative history of the Code, makes reference to the "new value exception." *See Report of the Commission on the Bankruptcy Laws of the United States,* H.R.Doc. No. 137, 93rd Cong., 1st Sess. pt. 2 at 241–42. Thus, it is unclear whether the *Los Angeles Lumber* dictum survived the enactment of the Bankruptcy Code.

The one Supreme Court decision dealing with the question of whether the "new value exception" survived the enactment of the Bankruptcy Code is of little help. *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). In *Ahlers,* the debtors, who were farmers, pro-

---

**38.** *See Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 203, 108 S.Ct. 963, 967, 99 L.Ed.2d 169 (1988) (stating that *Los Angeles Lumber* language allegedly establishing the new value exception was dictum).

**39.** *See also* § 1124 (defining impairment); Section II A above.

posed a Chapter 11 plan permitting them to retain the equity interest in their farm in exchange for their agreement to continue to farm to produce the funds to pay creditors under the plan. The plan did not provide for full payment to creditors. The court held that even if the "new value exception" continues to exist under the Bankruptcy Code, "sweat equity" did not constitute "money or money's worth" and thus the plan in *Ahlers* could not satisfy the *Los Angeles Lumber* dictum. *Id.* at 204, 108 S.Ct. at 967. Therefore, the court concluded that it need not decide whether the so-called "new value exception" survived enactment of the Code. *Id.* at 203, n. 3, 108 S.Ct. at 967 n. 3.

(2) Current thinking on the purchase by prepetition owners of participation rights in the reorganized debtor.

In the wake of *Ahlers*, the courts have been sharply divided on the vitality of the *Los Angeles Lumber* dictum. The Eleventh Circuit has not decided whether "old equity" may purchase participation rights in a reorganized debtor. In fact, only two circuits, the Ninth and Sixth, have ruled on the issue. *See In re Bonner Mall Partnership*, 2 F.3d 899 (9th Cir.1993) (the "new value exception remains a vital principle of bankruptcy law"); *U.S. Truck*, 800 F.2d 581 (6th Cir.1986) (confirming plan which allowed purchase of equity by prepetition shareholder without full payment to creditors). *See also Unruh v. Rushville State Bank*, 987 F.2d 1506 (10th Cir.1993) (stating that even if exception did survive enactment of Code, it was inapplicable on the facts before the court); *Bryson*

*Properties*, 961 F.2d 496 (same); *Greystone*, 995 F.2d 1274, 1285 (Jones, J., dissenting from grant of rehearing) (agreeing with panel opinion that had held that new value exception did not survive enactment of the Code); and *compare In re Snyder*, 967 F.2d 1126 (7th Cir.1992) (stating in dictum that exception survived enactment of the Code) with *Kham and Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir.1990) (another panel stating in dictum that exception did not survive enactment of the Code). Furthermore, the lower courts within this circuit are split over whether the new value exception survived the enactment of the Bankruptcy Code,[40] as are the lower courts in other circuits.[41]

Courts take three approaches in considering the vitality of the "new value exception." The most commonly accepted view is that *Los Angeles Lumber* created a "new value exception" that survived the enactment of the Code. The strongest argument in support of this view relies on *Dewsnup*, —— U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 in which the Supreme Court stated that the Code did not effect any major change in pre-Code judicially created practice unless there was "at least some discussion" in the legislative history of the Code of Congressional intent to make such a change. *Id.* at ——, 112 S.Ct. at 779; *see also Midlantic Nat'l Bank v. N.J. Dept. of Envtl. Protection*, 474 U.S. 494, 505, 106 S.Ct. 755, 759–60, 88 L.Ed.2d 859 *reh'g denied*, 475 U.S. 1090, 106 S.Ct. 1482, 89 L.Ed.2d 736 (1986). Since the *Los Angeles Lumber* "exception" was clearly part of pre-

**40.** *Compare In re S.A.B.T.C. Townhouse Ass'n*, 152 B.R. 1005 (Bankr.M.D.Fla.1993); *In re Yasparro*, 100 B.R. 91 (Bankr.M.D.Fla.1989); *In re Johnson*, 101 B.R. 307 (Bankr.M.D.Fla.1989) (all holding that exception applies under the Code) *with In re Miami Center Assocs., Ltd.*, 144 B.R. 937 (Bankr.S.D.Fla.1992); *In re James*, 1992 WL 21365 (Bankr.M.D.Fla. Jan. 2, 1992); *Piedmont Assocs.*, 132 B.R. 75; *In re Maropa Marine Sales Service & Storage, Inc.*, 90 B.R. 544 (Bankr. S.D.Fla.1988) (all doubting post-Code survival of exception).

**41.** *Compare, e.g., In re Eitemiller*, 149 B.R. 626 (Bankr.D.Idaho 1993); *In re Sovereign Group 1985–27, Ltd.*, 142 B.R. 702 (Bankr.E.D.Pa.1992); *In re SLC Ltd. V*, 137 B.R. 847 (Bankr.D.Utah 1992); *In re Mortgage Inv. Co. of El Paso, Tex.*, 111 B.R. 604 (Bankr.W.D.Tex.1990); *In re 222*

*Liberty Assoc.*, 108 B.R. 971 (Bankr.E.D.Pa. 1990); *In re Pullman Constr. Indus., Inc.*, 107 B.R. 909 (Bankr.N.D.Ill.1989); *In re Sherwood Square Assocs.*, 107 B.R. 872 (Bankr.D.Md.1989); *In re Ashton*, 107 B.R. 670 (Bankr.D.N.D.1989); *Aztec*, 107 B.R. 585; *In re 47th & Belleview Partners*, 95 B.R. 117 (Bankr.W.D.Mo.1988); *In re Henke*, 90 B.R. 451 (Bankr.D.Mont.1988) (all holding or suggesting that new value exception survived enactment of Code), *with, e.g., In re A.V.B.I., Inc.*, 143 B.R. 738 (Bankr.C.D.Cal. 1992); *In re Ribs Auto Sales, Inc.*, 140 B.R. 390 (Bankr.E.D.Va.1992); *In re Outlook/Century, Ltd.*, 127 B.R. 650 (Bankr.N.D.Cal.1991); *In re Winters*, 99 B.R. 658 (Bankr.W.D.Pa.1989); *In re Rudy Debruycker Ranch, Inc.*, 84 B.R. 187 (Bankr.D.Mont.1988) (all holding or suggesting that the exception no longer exists).

Code judicially created practice, these courts, relying on *Dewsnup,* have concluded that because the Code itself is silent and the legislative history of the Code is virtually nonexistent and inconclusive on the issue of the new value exception, it must have survived enactment of the Code. *See, e.g., In re S.A.B.T.C. Townhouse Ass'n,* 152 B.R. 1005, 1009 (Bankr.M.D.Fla.1993); *In re Sovereign Group 1985–27 Ltd.,* 142 B.R. 702, 707 (Bankr.E.D.Pa.1992); *In re SLC Ltd. V,* 137 B.R. 847, 853 (Bankr.D.Utah 1992). *See also Snyder,* 967 F.2d at 1130.

However, even in the aftermath of *Dewsnup,* a significant minority of courts have concluded that the *Los Angeles Lumber* "exception" did not survive enactment of the Code. These courts have reasoned that, in enacting § 1129(b)(2)(B)(ii), Congress replaced *Los Angeles Lumber*'s interpretation of the Act's "fair and equitable" standard with a congressionally enacted definition of that standard. In using the phrase "fair and equitable" in § 1129(b)(2)(B)(ii), Congress was aware of the *Los Angeles Lumber* dictum, yet nevertheless adopted a statutory approach that contains no reference to the "new value exception." These courts often find further support for their conclusion that the "new value exception" no longer exists by focusing on the Bankruptcy Commission's report to Congress, which arguably is the earliest part of the legislative history of the Bankruptcy Code. That report suggested that Congress codify the new value exception and permit participation by equity holders based on contributions which were not "money or money's worth." *Report of the Commission on the Bankruptcy Laws of the United States,* H.R.Doc. No. 137, 93rd Cong., 1st Sess. pt. 2 at 241–42. *See also* Victor Brudney, *The Bankruptcy Commission's Proposed Modifications of the Absolute Priority Rule,* 48 Am.Bankr.L.J. 305, 335–36 (1974). These courts conclude that Congress' failure to codify the Commission's proposal was tantamount to a rejection of the entire new value exception.[42] According to these courts, this

constitutes sufficient evidence that Congress intended to eliminate the new value exception. *See, e.g., In re Outlook/Century Ltd.,* 127 B.R. 650, 657 (Bankr.N.D.Cal.1991); *Winters,* 99 B.R. at 663. *See also Kham & Nate's,* 908 F.2d at 1361.

The third approach is to view the phrase "new value exception" as a misnomer, instead holding that the "exception" is not an exception at all, but is merely a corollary to the absolute priority rule. *Bonner Mall,* 2 F.3d 899 (9th Cir.1993); *In re Montgomery Court Apartments of Ingham County, Ltd.,* 141 B.R. 324 (Bankr.S.D. Ohio 1992); *Creekside Landing, Ltd.,* 140 B.R. 713; *In re Woodscape Ltd. Partnership,* 134 B.R. 165 (Bankr. D.Md.1991). *See also In re F.A.B. Indust.,* 147 B.R. 763 (C.D.Cal.1992) (discussing with apparent approval the argument that new value is a corollary to the absolute priority rule); Anthony L. Miscioscia, Jr., *The Bankruptcy Code and the New Value Doctrine: An Examination into History, Illusions, and the Need for Competitive Bidding,* 79 Va.L.Rev. 917 (1993); Elizabeth Warren, *A Theory of Absolute Priority, Annual Survey of American Law: Proceedings and Papers of a Bankruptcy Law Symposium* (Apr. 1991); Bruce A. Markell, *Owners, Auctions and Absolute Priority in Bankruptcy Reorganizations,* 44 Stan.L.Rev. 69 (1991); Raymond T. Nimmer, *Negotiating Bankruptcy Reorganization Plans: Absolute Priority and New Value Contributions,* 36 Emory L.J. 1009 (1987).

This third approach, which appears to represent the current trend, starts with the premise that, in a cramdown situation, § 1129(b) clearly bars prepetition owners from receiving an interest under the plan " on account of" their prior ownership interests. 11 U.S.C. § 1129(b)(2)(B)(ii). However, when prepetition owners infuse into the reorganized debtor necessary new value in the form of money or money's worth, the basis of their equity interest in the reorganized debtor is not their prepetition owner-

---

42. Such a rejection, however, could mean either that Congress adopted the new value exception as set out in *Los Angeles Lumber* and simply rejected the proposed modification, or that it rejected the new value exception in whole.

Thus, even the language of the Bankruptcy Commission Report is inconclusive in determining the viability of the "new value exception." *See Snyder,* 967 F.2d at 1130.

ship interest in the debtor, but rather their payment of new value for an interest in the reorganized debtor. *See Snyder*, 967 F.2d at 1130. Thus, according to this approach, the *Los Angeles Lumber* court merely enunciated a logical corollary to the absolute priority rule, not some "exception" to the absolute priority rule. Consequently, the corollary was logically included in the Bankruptcy Code as part of Congress's adoption of the absolute priority rule for application in the context of a cramdown of a Chapter 11 plan on dissenting classes of creditors. *See id.;* 11 U.S.C. § 1129(b)(2)(B)(ii).

### (3) The new value corollary.

■ This court finds the view that the "new value exception" is not an exception at all, but merely a corollary to the absolute priority rule, and that, as such, the new value corollary still exists under the Code, to be persuasive. The language of § 1129(b)(2)(B)(ii), which codifies the absolute priority rule, supports such a result. *See* 11 U.S.C. § 1129(b)(2)(B)(ii). Section 1129(b)(2)(B)(ii) provides that, in the context of a Chapter 11 cramdown on a dissenting creditor class, "old equity" may not receive any interest "on account of" its prior ownership. The infusion of a reasonable amount of new capital by prepetition owners in exchange for the equity interests of the reorganized debtor does not violate the plain language of § 1129(b)(2)(B)(ii) in any way. *Montgomery*, 141 B.R. at 343; *Woodscape*, 134 B.R. at 173. The equity the old owners receive under a plan is not given to them on account of their prior ownership interests in the debtor. Instead, it is given to them on account of, or in exchange for, the new value contributed. Thus, the purchase by prepetition owners of the debtor of the equity interests of a reorganized debtor for new value is not inconsistent with the absolute priority rule. *Woodscape*, 134 B.R. at 173.

Sound policy reasons warrant such a result. Two of the leading commentators on bankruptcy law, Professors Baird and Jackson, have long argued that when a business becomes insolvent, the creditors in effect become the owners of the business. This is because, where a debtor is insolvent, the existing equity is valueless. However, even where a business is insolvent, the going concern value of the business is an asset that can be liquidated to provide at least partial payment for creditors. *See generally* Douglas G. Baird & Thomas H. Jackson, *Bargaining After the Fall and the Contours of the Absolute Priority Rule*, 55 U.Chi.L.Rev. 738 (1988).

In most cases, as in this case, the majority of creditors will not wish to hold the equity in the reorganized debtor and run the business themselves. Instead, they would prefer to sell the equity interests to a buyer who will manage the business of the reorganized debtor and acquire the resources to pay the creditors under the plan. It makes no sense to suggest that the creditor body can sell the equity in the reorganized debtor to anyone except the debtor's prepetition equity holders. Such a blanket rule would, in fact, doom many confirmable Chapter 11 plans, since, as a practical matter, the debtor's prepetition owners may be the only persons who have any interest in buying the equity in the reorganized debtor. *See* Warren at 19–20. Old equity may be interested in purchasing the equity of the reorganized debtor for strictly personal reasons, such as preserving their jobs or continuing a family business. *Id.* at 21. In fact, such personal considerations may cause old equity to purchase the equity of the reorganized debtor at a price that is economically irrational. *Id.*

Allowing old equity to bid for the new equity also may enhance the return to creditors by setting off a bidding war. It signals the market as to what a party with full information about the debtor and its prospects is willing to pay for the equity in the reorganized debtor. *See* Markell, 44 Stan. L.Rev. at 110; Paul Milgrom and Robert Weber, *A Theory of Auctions and Competitive Bidding*, 50 Econometrica 1089, 1112 (1982). Obviously, creditors are better off if the bid of old equity causes others to investigate an investment in the reorganized debtor and to seek to outbid the debtor's prepetition equity owners. Thus, allowing the debtor's current owners to bid for the equity interests of the reorganized debtor may maximize the return to creditors by producing a true auction for the equity interests.

In fact, it is hard to come up with a logical reason why the debtor's prepetition owners should be barred as a matter of law from purchasing the equity of the reorganized debtor. If the debtor's prepetition owners' offer for the equity interests in the reorganized debtor is reasonable and necessary, contemplates a contribution of real assets, and is the best offer available, the creditors ought to be able to accept it.

This court finds that the "new value exception" is not really an exception to the absolute priority rule. Instead, the court holds that it is a corollary to the absolute priority rule, consistent with the language of § 1129(b)(2)(B)(ii) and sound bankruptcy policy. Thus, despite the enactment of the Bankruptcy Code, the new value corollary remains a vital part of bankruptcy law.

(4) When is the purchase by prepetition owners of the equity of a reorganized debtor consistent with the absolute priority rule?

■■■ However, before the purchase by prepetition owners of the equity of a reorganized debtor can be accepted as consistent with the absolute priority rule, three requirements must be satisfied. First, the new contribution must be in money or money's worth, meaning that what the creditors are to receive in exchange for the equity in the reorganized debtor must have a present realizable value. It cannot merely be a promise to do something in the future, such as a promise to manage the reorganized debtor or guaranty a loan to the reorganized debtor. *See Ahlers,* 485 U.S. at 204, 108 S.Ct. at 967.

■■■ Second, the contribution of new value must be necessary for the implementation of the proposed plan of reorganization. *Los Angeles Lumber,* 308 U.S. at 121–22, 60 S.Ct. at 10. In effect, the plan proponent must

show that, without such a contribution of new value for the equity of the reorganized debtor, the reorganization effort may well fail. *See Montgomery,* 141 B.R. at 345; *Creekside Landing,* 140 B.R. at 717. *See also* 11 U.S.C. § 1129(a)(11) (plan must be feasible, meaning that plan is not likely to lead to liquidation unless, of course, the plan contemplates the liquidation of the debtor, or lead to a need for further financial reorganization of the debtor); Section II D below. The necessity requirement is intended to insure that the equity of the reorganized debtor is not given to the prepetition owners in a sham sale for capital in excess of the reorganized debtor's needs. In the case of such a sham sale, the excess, unnecessary capital could be returned to the new owners in the form of a dividend, redemption or the like, resulting in the old owners acquiring the new equity for little or nothing (and on account of their prior ownership) to the detriment of creditors, in violation of the absolute priority rule. *See In re Mortgage Inv. Co. of El Paso, Tex.,* 111 B.R. 604, 620 (Bankr. W.D.Tex.1990). *See also Montgomery,* 141 B.R. at 344; *Woodscape,* 134 B.R. at 168.[43]

Finally, the purchase price paid by old equity for some or all of the equity in the reorganized debtor must be reasonably equivalent to the value of the new equity; that is, old equity must pay a fair price for the right to participate in the reorganized debtor. *Los Angeles Lumber,* 308 U.S. at 121–22, 60 S.Ct. at 10; *Montgomery,* 141 B.R. at 344. Reasonable equivalence is required by § 1129(b)(2)(B)(ii). This is because if a plan purports to give the debtor's prepetition owners the equity interests in the reorganized debtor at a bargain price, the prepetition owners will be receiving something "on account of" their prepetition own-

---

**43.** Some courts have held that the contribution must not only be necessary, but also be substantial. *See In re Potter Material Service, Inc.,* 781 F.2d 99, 101 (7th Cir.1986). This court disagrees with this line of cases. Instead, this court regards substantiality as being more appropriately considered in determining whether the contribution is real and necessary and in determining whether the plan is feasible. *See also, e.g., Yasparro,* 100 B.R. at 97 (although applying new value exception allegedly enunciated in *Los Ange-*

*les Lumber,* holding that substantiality is irrelevant as long as price paid by "old equity" is reasonably equivalent to value of rights received). Indeed, it is hard to imagine that any contribution in exchange for the equity of the reorganized debtor that is real and makes the plan feasible would not be "substantial." This is particularly true in light of the fact that courts using a substantiality test tend to define substantiality on an ad hoc basis.

ership. Thus, the plan would violate the absolute priority rule.

As a matter of auction theory, the ideal method for measuring the fairness of the price paid for the equity in the reorganized debtor is to offer it for sale to a fully informed investing public and to sell the equity to the highest bidder, be it the debtor's prepetition owners or outsiders. This court does not believe such a public auction is necessary. As a practical matter, the prospect of drawing more than a few bidders in such an auction is unrealistic. The market for equity participation for failing business is thin, and the market for failing small businesses is even thinner. *See* Warren at 19. Moreover, the market is inefficient; insiders (and possibly a few major creditors) of failing businesses, especially failing small businesses, clearly have superior access to information, giving them a significant upper hand in the bidding process. Finally, a general public marketing of the debtor's equity interests may run afoul of state or federal securities laws, and compliance with such securities laws may be beyond the debtor's financial abilities. *See, e.g.,* 15 U.S.C. § 77e; Fla.Stat. § 517.07. *See also* 11 U.S.C. § 1145. Thus, a general public auction of the equity interests in the reorganized debtor need not be held in every case to satisfy the new value corollary.

Rather, at least in all but the largest bankruptcy cases, the disclosure and confirmation procedures provided by Chapter 11 offer an acceptable alternative for marketing the ownership interests of the reorganized debtor.

Section 1125 requires a plan proponent to distribute a disclosure statement to all parties that have shown an economic interest in the reorganized debtor; that is, to all creditors and equity holders.[44] The disclosure statement must be approved by the court before it can be used to solicit votes for a plan. *See* 11 U.S.C. § 1125; Fed.R.Bankr.P. 3017(a). In order for the court to approve a disclosure statement, the court must be satisfied that it contains information sufficient for a "hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1). That level of information should be sufficient to alert claim holders and equity holders whether it is worth pursuing a bid for the equity of the reorganized debtor. Thus, at least in cases the size of the instant case, the disclosure statement is quite adequate to promote an informed bidding process among the parties.

Such a bidding process can take place regardless of whether the debtor's exclusive right to propose a plan has been terminated or has expired. *See* 11 U.S.C. § 1121(b), (c). If the debtor's exclusivity period has ended or been terminated, any creditor can propose a competing plan incorporating an attempt to outbid old equity for the equity in the reorganized debtor. 11 U.S.C. § 1121(c). Moreover, even if the debtor's exclusivity period has not ended, any creditor can move to lift exclusivity and then propose its own plan incorporating a competing bid. 11 U.S.C. § 1121(d).[45]

---

**44.** The disclosure statement is also sent to the U.S. Trustee. *See* Fed.R.Bankr.P. 3017(d). The rule gives the court the authority to order that the disclosure statement not be sent to members of any unimpaired class. However, any creditor with a significant unimpaired claim will most likely be aware of the case and know how to obtain a copy of the disclosure statement.

**45.** Several courts have concluded that, if a plan gives prepetition owners of the debtor the exclusive right to purchase the equity interests of the reorganized debtor, the plan violates the absolute priority rule. This is because the plan gives the prepetition owners something "on account of" their prepetition ownership; i.e., the exclusive right to bid. *See* 11 U.S.C. § 1129(b)(2)(B)(ii). *See In re ROPT Ltd. Partnership,* 152 B.R. 406, 412 (Bankr.D.Mass.1993); *Bjolmes,* 134 B.R. at

1010. *See also Bryson,* 961 F.2d at 504; *Piedmont Assocs.,* 132 B.R. at 79; *Outlook/Century, Ltd.,* 127 B.R. at 653–54. *But see Bonner Mall,* 2 F.3d at 909–911 (exclusive right not received on account of prepetition ownership).

The auction that the Chapter 11 disclosure and confirmation process creates should minimize the possibility of a prepetition owner being given an exclusive right to bid for the equity of the reorganized debtor. This is because the process allows the debtor's creditors to compete with the prepetition owners for the purchase of the equity interests of the reorganized debtor. Consequently, the process itself prevents old equity from receiving an exclusive right to purchase the ownership interests of the reorganized debtor in all cases.

If the plan process generates competing bids, market theory dictates that the highest bid be accepted. This is because the bidding process itself works to drive the price paid for the equity in the reorganized debtor up towards its fair market value. *See* Markell, 33 Stan.L.Rev. at 110; Preston McAfee & John McMillan, *Auctions and Bidding*, 25 J.Econ. Literature 699, 710–11 (1987). Thus, as long as the plan process generates competing bids, the court's role ought to be to simply determine which bid is worth more, and accept it.[46]

Of course, the plan process does not guarantee competing bids. Where there is only one bid for the ownership interests in the reorganized debtor, there is no guarantee that the sole bid is at the fair market value of the equity interests in the reorganized debtor. Thus, if only one party bids for the equity interests of the reorganized debtor, the court must determine whether the bid for the equity of the reorganized debtor is reasonably equivalent to the value of the equity interests. *See Los Angeles Lumber*, 308 U.S. at 121–22, 60 S.Ct. at 10.

Here, the prepetition owners of the debtor propose to purchase the equity interests of the reorganized debtor for $200,000. Obviously, that infusion of new value is "money or money's worth." Moreover, it is clearly necessary. Without the infusion of new value, the reorganized Debtor could not meet its obligations. *See Montgomery*, 141 B.R. at 345. Thus, the first two requirements for the purchase by prepetition owners of the equity of a reorganized debtor to be consistent with the absolute priority rule are met in the instant case.

(5) Is the prepetition owners' $200,000 bid for the equity interests of the reorganized Debtor reasonably equivalent to the value of the equity interests?

EquiVest has objected to the prepetition owners' bid to purchase the equity interests

of the reorganized Debtor. It has objected even though it made no competing bid for the equity interests in the reorganized Debtor.[47] Nevertheless, to measure whether the plan is fair and equitable with respect to EquiVest, this court must determine whether the prepetition owners' proposed infusion of value is reasonably equivalent to the value of the equity interests of the reorganized Debtor being parcelled out to the old equity owners.

A specific determination of the value of the equity interests of the reorganized Debtor is quite complex; indeed, one scholar has noted that such a valuation would usually be "a guess compounded by an estimate." H.R.Rep. No. 595, 95th Cong., 1st Sess. 222 (1977), U.S.Code Cong. & Admin.News 1978, p. 6181 (quoting Prof. Peter Coogan). *See also* Ralph A. Peeples, *Staying In: Chapter 11, Close Corporations, and the Absolute Priority Rule*, 63 Am.Bankr.L.J. 65, 85 n. 54 (1989) (and sources cited therein). Of course, the capitalization of future earnings is accepted to be the appropriate method for determining the value of the equity interests in the reorganized Debtor. *See Consolidated Rock Products v. DuBois*, 312 U.S. 510, 526–27, 61 S.Ct. 675, 685 (1941). Unfortunately, in this proceeding, the income capitalization approach is not useful in valuing the equity interests in the reorganized Debtor.

At first glance, the value of the equity interests in the reorganized Debtor would appear to simply be equal to the market value of the Debtor's lone asset, the Cypress Creek property, net of the liens upon it. Relying principally on the income capitalization approach, this court has determined that the Cypress Creek property is worth $2.27 million. *See* Section I above. Of course, EquiVest's secured claim and lien, equal to the value of the Cypress Creek property under § 506(a), is also $2.27 million. *See* Section I above. Thus, applying the income capitalization approach, this court would find

---

**46.** If the competing bids are in the form of competing plans, the Bankruptcy Code instructs the bankruptcy judge to consider the preferences of the creditors (and any equity holders) in choosing the plan to confirm. *See* 11 U.S.C. § 1125(c). Nothing in the Bankruptcy Code prohibits the bankruptcy judge from considering which bid/plan confers the greatest economic

value on the debtor's creditors and equity owners.

**47.** EquiVest has filed a competing plan of reorganization, but did not bid for the equity interests in the reorganized Debtor.

the equity interests in the reorganized Debtor to be valueless, since the Cypress Creek property is fully encumbered.[48] Thus, any contribution by the prepetition owners of the Debtor, no matter how small, would appear to be reasonably equivalent to its value.[49]

Common sense, however, suggests that the equity interests must be of some value here. If the equity interests in the reorganized Debtor are valueless, why would EquiVest object to the purchase of those interests by the prepetition owners of the Debtor? *See Ahlers*, 485 U.S. at 209, 108 S.Ct. at 970; *Kham & Nate's*, 908 F.2d at 1359. Noting this, the Supreme Court in *Ahlers* explicitly recognized that the ownership of a debtor has value that is independent of the market value of the business's assets. *Ahlers*, 485 U.S. at 207–208, 108 S.Ct. at 969. *See also S.A.B.T.C.*, 152 B.R. at 1011; *In re Sherwood Square Assocs.*, 107 B.R. 872, 887 (Bankr. D.Md.1989); *In re Pullman Const. Indus.*, 107 B.R. 909, 949 (Bankr.N.D.Ill.1989). Thus, even where the debtor consists of a single asset which is fully encumbered, the equity interests in the reorganized debtor likely have some value on the marketplace.

In a single asset real estate case, the equity interests in the reorganized debtor might be valuable for a number of reasons. First, the asset could end up being worth more than the court believes it is worth. If this happens, the owners of the equity interests, rather than the holder of an undersecured claim, would be entitled to that residual value, since the secured portion of a creditor's claim is limited to the value which the court determines for the property. *See Sherwood Square*, 107 B.R. at 887; 11 U.S.C. § 506(a). *Cf. Ahlers*, 485 U.S. at 208–09, 108 S.Ct. at

970. In addition, the mere control of the reorganized debtor has some value. *Ahlers*, 485 U.S. at 208, 108 S.Ct. at 969. *Pullman*, 107 B.R. at 949. Furthermore, those purchasing the equity interests in a reorganized debtor may see things of value that are not generally included in a capitalized earnings valuation of an enterprise. These would include things such as the opportunity to be paid a salary for managing the reorganized debtor and even the prestige of owning an attractive property. *See* Warren at 21; Peeples, 63 Am.Bankr.L.J. at 84. All of these things cannot be valued by the capitalization of future earnings approach, since they affect neither projected income nor risk.[50] In single asset real estate cases where the property is fully encumbered, the capitalized earnings value presumably has been entirely allocated to the valuation of the secured claim, as required by § 506 and the absolute priority rule. That leaves the question of how to value the highly speculative equity.

Unfortunately, the Supreme Court in *Ahlers* did not offer a hint as to how to measure the equity in a single asset case where the single asset is fully encumbered. This court can only conclude that it must look to the facts and circumstances of each single asset case to determine whether the new value infusion is reasonably equivalent to any quantifiable value being received by the purchaser of the equity. In the instant case, the prepetition owners of the Debtor, meaning essentially Murphy, propose to purchase the equity interests in the reorganized Debtor for $200,000. In light of the facts and circumstances of this case, $200,000 appears to be at least reasonably equivalent to the value of the equity interests in the reor-

**48.** The Debtor's feasibility projections claim that the property will have a net surplus of almost $1.6 million in ten years, not including the balloon payment due on EquiVest's claim in 2003. Had the Debtor proven that its projections were reasonable, the court would have had serious doubts as to whether the equity interests of the reorganized Debtor were truly valueless. Rather, the court would have reexamined its valuation of the Cypress Creek property, because, under § 506(a) and the absolute priority rule, the full value of the Cypress Creek property, including reasonably predictable residual value, must go to EquiVest. The Debtor did not, however, establish that those projections were reliable. In

fact, the court has serious doubts about the validity of the Debtor's projections. *See* Section II D below.

**49.** However, clearly insubstantial contributions would be insufficient to satisfy the feasibility test laid out in § 1129(a)(11). *See* Section II D below.

**50.** This would appear to be the case in most single asset real estate cases, since, in most of those cases, the property is fully encumbered prior to the filing of the bankruptcy petition. *See, e.g., Piedmont Assocs.*, 132 B.R. at 76; *Valrico Square*, 113 B.R. at 795.

ganized Debtor. *See, e.g., In re Sherwood Square Assocs.*, 107 B.R. 872, 887 (Bankr. D.Md.1989) (contribution "fair" in light of future prospects of the debtor). *See also Los Angeles Lumber*, 308 U.S. at 121, 60 S.Ct. at 10 (old stockholders may only receive a participation "reasonably equivalent to their contribution"); Peeples, 63 Am.Bankr.L.J. at 83–84. *Cf. Consolidated Rock Products*, 312 U.S. at 526–27, 61 S.Ct. at 685 (valuation is to be "based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth").[51]

Here, economically, old equity appears to be paying something for nothing. However, the prepetition owners' $200,000 bid is, in effect, a bet that the court's valuation of the Cypress Creek property is low, and that there will be some residual value left for the prepetition owners to capture once the Equi-Vest loan is paid off. It is also a gamble that the Debtor will have future income in excess of that projected by both the Debtor and EquiVest, such that it will be able to service its debt under the plan and have enough left over to pay Murphy and his colleagues nice salaries.[52] Moreover, Murphy clearly has significant personal time and effort invested in running the Debtor. His tone and demeanor while testifying made it clear that he has a great deal of his own ego caught up in saving his SM empire. Murphy seems to believe that he alone can rescue the Debtor and its affiliates from financial disaster. Thus, there are significant noneconomic reasons underlying Murphy's almost desperate desire to retain control of the Debtor. What he is willing to pay for the equity of the reorganized Debtor is not the result of a rational valuation by Murphy; instead, it is determined by how much cash Murphy thinks is necessary to make his proposed plan work. The irrationality of Murphy's bid in economic terms is evidenced by the fact that the reorganized Debtor will be balance sheet insolvent on the effective date of the

plan and the fact that Murphy has not produced reasonable projections of the reorganized Debtor's financial future. In buying the equity of the reorganized Debtor, Murphy is playing the lottery, and gambling on a long shot.

Thus, this court finds that the proposed $200,000 contribution by Murphy is at least reasonably equivalent to the value of the equity interests in the reorganized Debtor. Indeed, it probably far exceeds any rational value that the equity interests in the reorganized Debtor could have. Therefore, the prepetition owners' bid for the equity interests of the reorganized Debtor under the Debtor's plan meets the requirements of the new value corollary. Consequently, the prepetition owners may purchase the equity interests of the reorganized Debtor in accordance with the Debtor's plan without violating the absolute priority rule.

### C. Is the Debtor's plan fair and equitable to EquiVest's secured claim?

EquiVest's third objection is that the Debtor's plan is not fair and equitable to EquiVest. The court agrees.

Section 1129(b)(1) provides that, for a plan to be crammed down over the objections of an impaired class of creditors or interest holders, the plan must be "fair and equitable" with respect to that class. 11 U.S.C. § 1129(b)(1). Section 1129(b)(2)(A) sets forth minimal standards that each plan is required to meet to be considered fair and equitable. Section § 1129(b)(2)(A) states, in pertinent part, that a plan must provide, with respect to a class of secured claims:

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

---

51. Some courts have interpreted "reasonable equivalence" to require old equity's contribution to equal or exceed the value of the acquired interest in the reorganized debtor. *See, e.g., Potter*, 781 F.2d at 101. The precise calculations required by such a standard are not required by *Los Angeles Lumber*, and are inconsistent with this court's view of the "reasonably equivalent"

requirement. *See* Peeples, 63 Am.Bankr.L.J. at 83–84. "Reasonably equivalent" and "equivalent" are not synonyms. "Reasonably" precludes a requirement of precise equivalence.

52. Murphy has waived all management fees for the next ten years.

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization of the holders of the indubitable equivalent of · such claims.

11 U.S.C. § 1129(b)(2)(A).

In this case, the Debtor's plan attempts to meet the requirements of § 1129(b)(2)(A) with respect to Class 1, which consists of only EquiVest's secured claim, by making cash payments to EquiVest pursuant to § 1129(b)(2)(A)(i). Section 1129(b)(2)(A)(i) has three requirements: the plan must (a) allow EquiVest to maintain its lien on the existing collateral; and (b) provide for cash payments to the EquiVest totaling at least the allowed amount of its secured claim (the "face amount" test); and (c) provide Equi-Vest with payments of a present value at least equal to the value, as of the effective

date of the plan, of EquiVest's interest in the estate's interest in the collateral, i.e. Equi-Vest's secured claim (the "present value" test). 11 U.S.C. § 1129(b)(2)(A)(i). As long as EquiVest's claim is undersecured and EquiVest has not made the § 1111(b) election, satisfaction of the present value test with respect to the secured claim will necessarily satisfy the face amount test with respect to EquiVest's secured claim, because payment of EquiVest's secured claim with a present market rate of interest over any period of time requires the Debtor to pay more than the face amount of the secured claim. See In re Arnold, 806 F.2d 937, 940 (9th Cir.1986); 11 U.S.C. § 1111(b).

Here, the Debtor's plan clearly meets the first requirement § 1129(b)(2)(A)(i), since the plan allows EquiVest to maintain its lien. Moreover, EquiVest is undersecured and has not made the § 1111(b) election.[53] Thus, as long as the Debtor's plan provides for cash payments to be made to EquiVest at an interest rate sufficient to pay EquiVest the present value of its secured claim, the Debtor's plan meets the requirements of § 1129(b)(2)(A)(i) and can be forced on Equi-Vest. See Arnold, 806 F.2d at 940.

■■■ EquiVest, however, claims that the 8% interest rate the Debtor's plan proposes to pay it is insufficient to provide Equi-Vest with the present value of its secured claim, and thus that the plan is not fair and equitable to EquiVest.[54] The court agrees.

**53.** EquiVest did not make the § 1111(b)(2) election as of the conclusion of the hearing on the Debtor's disclosure statement. See Fed. R.Bankr.P. 3014. Instead, EquiVest purported to reserve the right to make the election when the Debtor's plan is finalized. Where EquiVest gets that "right" to delay having to make the § 1111(b)(2) election is not clear.

**54.** EquiVest also claims that the proposed stretchout by the plan of EquiVest's five year loan to the Debtor to ten years (based on a twenty year amortization) makes the plan unfair. It is clear that, even if a plan satisfies the technical requirements enunciated in § 1129(b)(2) by providing a creditor with an appropriate interest rate, the plan is not necessarily fair and equitable. Section 1129(b)(2) merely states the minimum requirements of a fair and equitable plan. See Matter of Sandy Ridge Devel. Corp., 881 F.2d 1346, 1352 (5th Cir.), reh'g denied, 889 F.2d 663 (1989); Matter of D & F Constr., Inc., 865 F.2d

673, 675 (5th Cir.1989); Miami Center Assocs., 144 B.R. at 940; Kenneth Klee, Cramdown II, 64 Am.Bankr.L.J. 229, 230 (1990). See also 11 U.S.C. § 102(3) (defining the term "includes" as not limiting). Rather, this court must consider the plan "in the context of the rights of the creditors under state law and the particular facts and circumstances" of the case. D & F Constr., 865 F.2d at 675.

It has been consistently held that the fair and equitable requirement does not prohibit long term payouts. See, e.g., In re Manion, 127 B.R. 887, 890 (Bankr.N.D.Fla.1991); In re White, 36 B.R. 199, 203 (Bankr.D.Kan.1983). To be fair and equitable, the proposed stretchout must simply be reasonable. Manion, 127 B.R. at 890. In fact, lengthy stretch out periods for real estate have received judicial approval. See In re James Wilson Assocs., 965 F.2d 160 (7th Cir.1992) (25 year amortization, 7 year balloon); In re Mulberry Agric. Enter., Inc., 113 B.R. 30 (Bankr.D.Kan. 1990) (30 years); In re Mulnix, 54 B.R. 481

### (1) Choosing an interest rate: what approach?

■ Courts differ as to how to calculate the interest rate that provides a secured creditor the present value of its secured claim, as required by § 1129(b). EquiVest urges this court to use the "coerced loan" approach, which requires the creditor to be paid "the current market rate of interest used for similar loans in the region" in workout situations. *See, e.g., In re Hardzog,* 901 F.2d 858, 860 (10th Cir.1990); *In re Stratford Assocs. Ltd. Partnership,* 145 B.R. 689, 702 (Bankr.D.Kan.1992); *In re Hulen Park Place Ltd.,* 130 B.R. 39, 42 (N.D.Tex.1991). The difficulty with such an approach, of course, is that there usually is no legal market for forced loans. *See In re Oaks Partners, Ltd.,* 135 B.R. 440, 444–45 (Bankr. N.D.Ga.1991); *In re Computer Optics, Inc.,* 126 B.R. 664, 672 (Bankr.D.N.H.1991). Moreover, even if there were a market for forced loans, that market would be economically inefficient. Vulture capitalists use the urgency of a Chapter 11 debtor's position to extract a premium by charging an interest rate in excess of the actual risks of the loan. *See In re Bloomingdale Partners,* 155 B.R. 961, 977 (Bankr.N.D.Ill.1993).[55] The premium approach is inconsistent with the Bankruptcy Code, which requires only that the secured creditor be compensated for the use of its money over the life of the plan, without any premium beyond the rate suggested by the risk of what amounts to a forced loan. *See ROPT,* 152 B.R. at 409; *In re Shannon,* 100 B.R. 913, 939 (S.D. Ohio 1989). Thus, as unrealistic as it sounds at first blush, the existence of the bankruptcy case should be ignored as a factor in computing the interest rate.

■ Instead, the "time value of money" approach, which appears to be accepted by the majority of courts, should be applied in determining the appropriate interest rate for a cramdown under § 1129(b). *See, e.g., Bloomingdale Partners,* 155 B.R. at 977; *In re IPC Atlanta Ltd. Partnership,* 142 B.R. 547, 557–58 (Bankr.N.D.Ga.1992); *Oaks Partners,* 135 B.R. at 447; *Computer Optics,* 126 B.R. at 672; *Aztec,* 107 B.R. at 588. *See also In re Fowler,* 903 F.2d 694, 698 (9th Cir.1990) (remanding for further factual support); *U.S. v. Doud,* 869 F.2d 1144, 1146 (8th Cir.1989) (applying time value of money approach for purposes of § 1225(a)(5)(B)). The time value of money approach takes an appropriate risk-free rate and adds a risk premium, measured in basis points,[56] sufficient to compensate the holder of a secured claim for the inherent risks imposed upon it by the proposed plan. *Bloomingdale Partners,* 155 B.R. at 977. The appropriate risk-free rate is equal to the current interest rate being paid on treasury bonds with a duration similar to the length of the plan. *IPC Atlanta,* 142 B.R. at 557; *Oaks Partners,* 135 B.R. at 446; *Computer Optics,* 126 B.R. at 672. The risk premium reflects the length of the deferment, the quality of the property, and the risk of subsequent default by the debtor. *See Matter of Southern States Motor Inns,* 709 F.2d 647, 651 (11th Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984) (construing present value

(Bankr.N.D.Iowa 1985) (26 years). *But see Miami Center Assocs.,* 144 B.R. 937 (rejecting 30 year amortization, 10 year balloon on hotel loan).

In this case, the Debtor's proposed twenty year amortization with a ten year balloon is not unreasonable. The fact that the original EquiVest loan to the Debtor was for a term of five years is not dispositive, or even persuasive. As long as the feasibility of a plan can be shown and the creditor is properly compensated and protected for the use of its money via an appropriate interest rate, it is not improper for a plan to stretch out payments, even if the loan was originally intended to be a short term loan. *See In re Hollanger,* 15 B.R. 35, 47 (Bankr.W.D.La.1981) (seven year extension in farm reorganization); *In*

re Benson, 9 B.R. 854, 858 (Bankr.N.D.Ill.1981) (20 year extension of 2 year note).

**55.** The facts of the instant case confirm the fact that Chapter 11 debtors are at a serious disadvantage in negotiating financing. In the spring of 1992, Riverside Capital offered to lend the Debtor the money the Debtor claimed it needed to take-out EquiVest, up to 75% of the value of the Cypress Creek property. The terms of Riverside's proposal were exorbitant. It sought, for a three year loan, an interest rate of 15%, plus equity participation of 10%–20%, and a $34,000 consulting fee.

**56.** A basis point is simply one hundredth of one percent.

for deferred tax claims under § 1129(a)(9)(C)).

### (2) Applying the time value of money approach to identify the appropriate interest rate in this case.

Here, the Debtor's plan calls for cash payments of principal and 8% interest over a ten year period based on a twenty year amortization, with a balloon payment of all then-remaining principal in year ten. Thus, the appropriate risk-free rate is the ten year treasury bond rate. *IPC Atlanta,* 142 B.R. at 557; *Oaks Partners,* 135 B.R. at 446; *Computer Optics,* 126 B.R. at 672. As of Monday, August 23, 1993, the start of the week in which this decision was announced, that rate was approximately 5.65%.[57] *See Treasury Bonds, Notes & Bills,* Wall St. J., August 24, 1993, at C16 (quoting ask yield on August, 2003 treasury bond as of August 23, 1993). Consequently, the base rate to be used in applying the time value of money approach in this case is 5.65%.

Computing the risk premium to be added to the base rate is not quite so simple. Indeed, in this case, computation of the risk premium is made even more difficult by the fact that the Debtor's plan forces EquiVest to make a 100% loan to value. Unfortunately, the Debtor has offered no evidence that an efficient market for loans that are 100% loan to value exists in the real world.

In the absence of an efficient (or, for that matter, any) market for 100% loans, the most appropriate methodology for determining the risk premium on 100% loans is the band of investment technique employed by the court in *Bloomingdale Partners.* The band of investment technique attempts to simulate the financing scheme ordinarily employed by owners of commercial real estate. The band of investment technique divides a 100% loan into two portions: (1) a 75% senior debt portion; and (2) a 25% junior interest portion. *See Bloomingdale Partners,* 155 B.R. at 984–85. Risk premiums are determined for each portion: the senior debt portion earns the risk premium a mortgage-holder would require, and the junior interest earns the substantially higher risk premium an equity investor would require. A weighted risk premium is then computed by multiplying the senior debt risk premium by .75 and the junior interest risk premium by .25. *Id.*

With respect to the 75% senior debt portion, Robert LaChapelle, EquiVest's interest rate expert, testified that no institutional lenders would make the loan of 100% loan to value that the Debtor's plan requires of EquiVest. However, he also testified that institutional investors would make a 75% loan to value loan on "acceptable" commercial real estate in the Fort Lauderdale area at a risk premium of 205–230 basis points over the risk-free rate for 10 year loans, depending on the specific risks associated with the borrower in question.[58] Nothing in the testimony of

57. Section 1129(b)(2)(A)(i)(II) requires the appropriate interest rate to be measured from the effective date of the plan, which the Debtor's plan provides will be ten days following confirmation of the plan. *See* 11 U.S.C. § 1129(b)(2)(A)(i)(II). "Confirmation" could be construed to mean that the appropriate rate should be measured as of the date on which the court hears evidence on confirmation, or as of the date on which it enters an order confirming the plan. Because information on current risk-free rates is readily available in the marketplace, the court should use the interest rate on the day it rules on the validity of the plan, because that would be the closest date to any hypothetical effective date of the Debtor's plan. The more recent date is more appropriate than the date of the confirmation hearing (in this case, in March 1993), because it is more consistent with the theory underlying this court's approach to identifying the appropriate interest rate. This court's approach gives EquiVest a risk premium for

loaning money to the Debtor for ten years instead of purchasing ten year treasury notes, which are riskless. EquiVest could only purchase ten year treasury notes at today's rate, not the rate in effect at the time of the confirmation hearing. *See Bloomingdale Partners,* 155 B.R. at 986 (opinion issued June 7, 1993, using June 4, 1993 risk-free rate).

58. LaChapelle actually testified that the interest rate for such a loan would be 8¼% to 8½%. His testimony reflects a risk premium of 205–230 basis points over the approximate yield on a 10 year treasury bond at the time of the confirmation hearing, which was 6.10%. *See Treasury Bonds, Notes & Bills,* Wall St.J., at C16 (March 15, 1993) (quoting ask yield for February, 2003 treasury bond as of Friday, March 12, 1993).

The risks associated with the Cypress Creek property have not substantially changed since the confirmation hearing.

LaChapelle or Fred Welker, the Debtor's interest rate expert, suggests that the Cypress Creek property would be unacceptable to an institutional lender to collateralize a loan at 75% loan to value, and at an appropriate interest rate. LaChapelle testified only that no institutional lender would lend to the Debtor at 100% loan to value: he did not claim that no institutional lender would lend to the Debtor at 75% loan to value.

Although the Cypress Creek property is clearly acceptable to serve as collateral for a loan of 75% loan to value, there is greater risk associated with it than with other, similar commercial real estate in the Fort Lauderdale area. Some one-third of the Cypress Creek property is occupied by Thasc, a tenant with an above-market, soon-to-expire lease. In addition, this court listened to Murphy's testimony and the litany of charges levelled against him by other witnesses. The court is left with serious doubt about Murphy's qualifications to manage the reorganized Debtor.[59] The fact that the plan proposes to allow Murphy to manage the business of the reorganized Debtor is in and of itself another element of risk that must be considered in determining the appropriate rate of interest for the EquiVest claim. Consequently, the court opts for a risk premium at the high end of LaChapelle's scale. The court holds that the risk premium for the senior debt portion of the loan is 230 basis points over the risk-free rate.

Such a holding is, by itself, sufficient to make the court conclude that the Debtor's plan is not fair and equitable to EquiVest's secured claim. The plan proposes to pay EquiVest interest at a rate of 8%, which implies a risk premium of 235 basis points. *See Treasury Bonds, Notes & Bills,* Wall St.J., August 24, 1993, at C16 (quoting ask yield on August, 2003 treasury bond as of August 23, 1993). The risk premium required on the 75% senior debt portion, 230 points, is, by itself, about equal to the risk premium the Debtor's plan proposes. Obviously, the weighted risk premium to be computed using the senior debt risk premium and the substantially higher equity risk premium will also be higher than 8%. Indeed, the risk premium on the equity portion would be in the range of 900 basis points, which would yield a weighted risk premium of 398 basis points.[60]

Thus, it is clear that the Debtor's plan does not propose to pay EquiVest an adequate risk premium, and thus does not propose to pay EquiVest an interest rate sufficient to pay EquiVest the present value of its claim over the life of the plan. Consequently, the court holds that the Debtor's plan is not fair and equitable with respect to EquiVest's secured claim.

## D. Is the Debtor's plan feasible?

EquiVest's fourth objection to the Debtor's plan is that, as proposed, the Debtor's plan is not feasible. The court agrees.

To be confirmed, a plan of reorganization must be feasible. Section 1129(a)(11) provides that a plan is not feasible if the plan is "likely to be followed by the *liquidation, or the need for further financial* reorganization, of the debtor . . ., unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). Section 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan. *In re Nelson,* 84 B.R. 90, 93 (Bankr.W.D.Tex.1988). Such a requirement prevents the confirmation of visionary schemes which promise creditors and interest holders more under a

---

59. *See also* Section II E below.

60. As *Bloomingdale Partners* notes, such a computation is inherently an estimate. *Bloomingdale Partners,* 155 B.R. at 983. This court's estimate is based on LaChapelle's testimony that a lender would require a minimum 590 basis point risk premium on a 90% loan to the Debtor. Using this court's adjustment of 230 basis points for the 75% senior debt portion, LaChapelle's testimony implies an adjustment of at least 1668 basis points for the 25% junior interest portion. *See Bloomingdale Partners,* 155 B.R. at 984–985. This implied adjustment is artificially high, since it is weighs heavily the fact that the Debtor is in bankruptcy, a consideration the court has already held is irrelevant for purposes of computing the interest rate required under § 1129(b). A premium in the area of 900 basis points on the 25% junior interest portion seems more appropriate.

proposed plan than the debtor can possibly provide. *Matter of Pizza of Hawaii, Inc.,* 761 F.2d 1374, 1382 (9th Cir.1985). Section 1129(a)(11) does not, however, require a plan to guarantee success. Rather, the plan must simply offer a reasonable assurance of success. *Kane v. Johns–Manville Corp.,* 843 F.2d 636, 649 (2d Cir.1988); *In re Monnier Bros.,* 755 F.2d 1336, 1341–42 (8th Cir.1985).

At first blush, the Debtor's plan appears feasible, even at higher interest rates in the range suggested by this court.[61] At the effective date of the plan, the Debtor would have cash on hand of approximately $337,-000.[62] An initial 8.5% dividend would be paid on the effective date of the plan with that cash, to the extent possible, to both the Class 5 general unsecured creditors, whose claims total approximately $175,000, and EquiVest's Class 3 unsecured deficiency claim of approximately $3.23 million. The remainder of the unsecured dividend is to be paid by the reorganized Debtor in equal quarterly installments over the next two years, using the funds generated by the Cypress Creek property. In addition, the plan proposes to make monthly cash payments of principal and interest to EquiVest in satisfaction of its secured claim out of the Cypress Creek property cash flows, based on a twenty year amortization and culminating in a balloon payment of all remaining principal in 2003. The plan does not specify how the Debtor will make the balloon payment.[63] The Debtor argues that its plan is entirely feasible, leaving the Debtor with positive cash reserves in every year and with cash reserves of almost $1.6 million by 2003:[64]

## CASH FLOWS OF THE REORGANIZED DEBTOR, AS PROJECTED BY THE DEBTOR

| | Effective | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|
| Cash, beginning | $337 | $ 0 | $ 40 | $ 105 | $209 |
| Cash inflows: | | | | | |
| Net cash flow, projected | | 249 | 270 | 220 | 229 |
| Add back: | | | | | |
| Waived mgmt & site fees | | 54 | 56 | 58 | 61 |
| Forgone improvements | | 50 | 52 | 54 | 56 |
| Total inflows: | 337 | 353 | 378 | 332 | 346 |
| Cash outflows: | | | | | |
| Admin. expenses | 100 | | | | |
| 1992 prop. taxes | 79 | | | | |
| Cash coll. payment to EquiVest for Ft. | | | | | |
| Laud. rent arrearages | 38 | | | | |
| Total outflows | 217 | | | | |
| Cash available for debt service | 120 | 353 | 378 | 332 | 346 |
| Debt service: | | | | | |
| Secured claim ($2.27 million), at 8% | | 228 | 228 | 228 | 228 |
| Unsecured dividend ($290,000), at 8.5% | 120 | 85 | 85 | | |
| Total debt service | 120 | 313 | 313 | 228 | 228 |
| Cash ending | $ 0 | $ 40 | $ 105 | $ 209 | $327 |

| | Effective | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|
| Cash, beginning | $337 | $327 | $ 458 | $ 604 | $765 |
| Cash inflows: | | | | | |
| Net cash flow, projected | | 238 | 248 | 258 | 268 |

**61.** *See* Section II C above.

**62.** This $337,000 would be made up of the $137,-000 currently on hand, which includes the approximately $73,000 the Trustee received from Murphy in settlement of all preference claims against him, and $200,000 to be contributed by Murphy as new value.

**63.** The plan also proposes to pay the 8.5% dividend to Class 2, the claim of Capital Bank. This court has already held that such a payment is impermissible. *See* Section II A above.

**64.** All figures are rounded and are in thousands.

| | Effective | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|
| Add back: | | | | | |
| Waived mgmt & site fees | . | 63 | 65 | 68 | 71 |
| Forgone improvements | | 58 | 61 | 63 | 66 |
| Total inflows: | 337 | 359 | 374 | 389 | 405 |
| Cash outflows: | | | | | |
| Admin. expenses | 100 | | | | |
| 1992 prop. taxes | 79 | | | | |
| Cash coll. payment to EquiVest for Ft. | | | | | |
| Laud. rent arrearages | 38 | | | | |
| Total outflows | 217 | | | | |
| Cash available for debt service | 120 | 359 | 374 | 389 | 404 |
| Debt service: | | | | | |
| Secured claim ($2.27 million), at 8% | | 228 | 228 | 228 | 228 |
| Unsecured dividend ($290,000), at 8.5% | 120 | | | | |
| Total debt service | 120 | 228 | 228 | 228 | 228 |
| Cash ending | $ 0 | $458 | $ 604 | $ 765 | $942 |

| | Effective | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| Cash, beginning | $337 | $ 942 | $1135 | $1345 |
| Cash inflows: | | | | |
| Net cash flow, projected | | 279 | 290 | 301 |
| Add back: | | | | |
| Waived mgmt & site fees | | 74 | 77 | 80 |
| Forgone improvements | | 68 | 71 | 74 |
| Total inflows: | 337 | 421 | 438 | 455 |
| Cash outflows: | | | | |
| Admin. expenses | 100 | | | |
| 1992 prop. taxes | 79 | | | |
| Cash coll. payment to EquiVest for Ft. | | | | |
| Laud. rent arrearages | 38 | | | |
| Total outflows | 217 | | | |
| Cash available for debt service | 120 | 420 | 438 | 455 |
| Debt service: | | | | |
| Secured claim ($2.27 million), at 8% | | 228 | 228 | 228 |
| Unsecured dividend ($290,000), at 8.5% | 120 | | | |
| Total debt service | 120 | 228 | 228 | 228 |
| Cash ending | $ 0 | $1135 | $1345 | $1572 |

However, the court's review of the Debtor's projections leads it to believe that a number of problems exist with the feasibility of the Debtor's plan.

(1) Cash inflows.

 The projection of net cash flows to be generated by the Cypress Creek property relied on by the Debtor to establish the feasibility of the Debtor's plan comes from the appraisal of the Debtor's expert, Fred Roe. No party disputes the projection of net cash flows made by Roe. The problem arises when the Debtor attempts to alter Roe's projections. The Debtor attempts to add management and site fees to be paid to Murphy and scheduled capital and tenant improvements back to Roe's projected cash flows, thereby increasing the cash available to fund the plan. Roe considered these as expenses—and thus deductions from cash flow—in preparing his appraisal. Apparently, the Debtor's analysis is based on the premise that it will pay no management and site fees during the life of the plan and it will make no tenant or capital improvements.

The first of these add-backs, management and site fees, is entirely appropriate, since Murphy testified that he would waive those fees for the length of the plan. However, EquiVest correctly argues that forgoing all capital and tenant improvements for the next ten years is unreasonable and renders the

plan unfeasible. The rents a commercial real estate property is capable of generating depend in large measure on the quality of that property. All other things being equal, if major improvements are made to the property, the owner of the property should expect that the rents generated by the property will increase. Conversely, all other things being equal, if the property is allowed to degenerate over a long or even a short period of time, the rents generated by the property will decrease. For this reason, a number of courts have held that a plan must provide a reasonable reserve for capital and tenant improvements. *See Stratford Assocs.*, 145 B.R. at 698; *In re Prince Manor Apartments, Ltd.*, 104 B.R. 414, 416 (Bankr.N.D.Fla.1989).

Here, the Debtor, while maintaining a small reserve for repairs, proposes to eliminate all tenant and capital improvements for the life of the plan. The Debtor, however, attempts to have its cake and eat it too: it projects the decreased expense, with no corresponding rental decrease. It is more than likely that elimination of capital and tenant improvements will simply result in a deterioration of the property and rent roll, producing a corresponding decrease in the rents generated by the Cypress Creek property. Thus, the Debtor's projections are unrealistic.

Clearly, the reorganized Debtor will have a need for capital improvements over the next ten years if it is to keep the building in good enough condition to attract tenants. Things break. Things wear out. Things are rendered inefficient by advancing technology. As to tenant improvements, the most obvious needs will likely arise in connection with the imminent expiration of the lease of Thasc, the Debtor's largest tenant. It is very likely that the Debtor will incur significant tenant improvement expenses either in convincing Thasc to remain or in attracting replacement tenants should Thasc leave.

It is clear that the reorganized Debtor will have a need to make capital and tenant improvements over the life of the plan. Unfortunately, the record in this proceeding does not permit the court to determine what those expenses are likely to be. Clearly, the reorganized Debtor's need to make tenant and capital improvements will reduce the Debtor's net cash flow. Without some indication of the amount of the reduction, it is impossible to determine whether the reorganized Debtor can pay for the required improvements and meet its obligations under the plan. Therefore, the Debtor has failed to establish the feasibility of the plan.

### (2) Cash outflows.

EquiVest has two serious objections to the cash outflows projected by the Debtor's plan. First, EquiVest claims that it is entitled to be reimbursed for paying the Debtor's 1991 property taxes out of its alleged cash collateral. Second, EquiVest claims that the plan fails to create a sufficient working capital reserve. While the court rejects EquiVest's first contention, it holds that the Debtor's plan must create a reasonable working capital reserve.

The state court orders establishing a lockbox provided that the prepetition gross rents of the property were to be deposited into the lockbox account. Included in those gross rents deposited into the lockbox account were "passthroughs"; specifically, payments by the tenants to the Debtor for real estate taxes. Under the lockbox orders, the funds in the lockbox account were to be used to pay the interest owed to EquiVest each month and then applied to the necessary operating expenses of the Cypress Creek property.

During the pendency of this bankruptcy case, the Debtor renegotiated its ground lease with the City of Fort Lauderdale. *See* n. 25 above. As a condition for lowering the future lease payments, Fort Lauderdale required that the Debtor pay the past-due 1991 property taxes. In February 1993, this court approved an agreed cash collateral order, which provided that, to the extent EquiVest's cash collateral was used to pay the past-due 1991 real estate taxes, EquiVest was entitled to be adequately compensated for the resulting diminution in the value of its collateral. However, EquiVest was only entitled to compensation to the extent its cash collateral was used to pay the real estate taxes. The Debt-

or reserved the right to question whether the passthroughs were a part of EquiVest's cash collateral until the confirmation hearing on the Debtor's plan of reorganization.

The rents generated by the Cypress Creek property are collateral for EquiVest's loan to the Debtor under both its state court lockbox orders and under Florida law. *See* Fla.Stat. § 697.07; *In re Ameriswiss Assocs.*, 148 B.R. 349, 352 (Bankr.S.D.Fla.1992). They are also "cash collateral" under Bankruptcy Code § 363(a). *See* 11 U.S.C. § 363(a). EquiVest claims that the state court lockbox orders are broad enough to make the passthroughs part of its cash collateral as well, and thus to entitle it to an adequate protection payment in the amount of the 1991 property taxes under the cash collateral order.

■ The Debtor's leases with its tenants are "net," which means, among other things, that, *in addition to paying rent,* the tenants pay to the Debtor their proportionate shares of the Debtor's real estate taxes, which the Debtor then passes through to the city of Fort Lauderdale. Those passthroughs went into the lockbox account, but did not become part of EquiVest's cash collateral. They are not rents. The Debtor was a mere conduit in forwarding the tenants' tax payments to the collector. Consequently, EquiVest is not entitled to adequate protection payments for the use of the passthroughs to pay the 1991 property taxes. Since the passthrough payments were not part of EquiVest's collateral, the payment of the 1991 taxes from the passthroughs did not affect EquiVest's collateral position.

■ On the other hand, EquiVest is correct in pointing out that, to be feasible, the Debtor's plan must provide for a reasonable working capital reserve. A cushion of money is necessary to guard against potential pitfalls in the execution of the Chapter 11 plan. *See In re Hirt,* 97 B.R. 981, 984 (Bankr. E.D.Wisc.1989); *In re Merrimack Valley Oil Co., Inc.,* 32 B.R. 485, 489 (Bankr.D.Mass. 1983). A plan which is so "narrowly constructed ... that any swing in the negative causes the plan to fail" is impermissible. *In re Snider Farms, Inc.,* 83 B.R. 1003, 1013 (Bankr.N.D.Ind.1988) (Chapter 12 case). The court need not determine what would constitute an adequate working capital reserve for the reorganized Debtor. Suffice it to say a complete lack of working capital is clearly unreasonable.[65] *Compare Snider Farms,* 83 B.R. at 1013. Without proof of a reasonable working capital reserve, the Debtor's plan cannot be feasible.

### (3) Debt service.

Obviously, this court's ruling that the 8% interest rate the Debtor proposes to pay EquiVest on its secured claim is too low to provide for the satisfaction of EquiVest's secured claim in present value terms makes the Debtor's debt service projections unrealistic.[66]

### (4) Balloon payment.

The Debtor's plan calls for it to make a balloon payment of all remaining principal to EquiVest in 2003. Until then, the Debtor will make payments based on a twenty year amortization. The Debtor has not explained how it plans to obtain the funds necessary to make the balloon payment. Nevertheless,

---

**65.** EquiVest also argues that, beyond a working capital reserve, the Debtor is also required to have a cushion of cash inflows above its debt service. While this court holds that a reasonable working capital reserve is required, the court does not require the Debtor to have any additional cushion above its debt service. Such a cushion, while important, goes only to the risk involved in carrying out the plan, and it has already been considered in determining the risk involved in the payment of the EquiVest secured claim and thus in determining the interest rate the Debtor is required to pay EquiVest. Taking the debt service cushion into account in measur-

ing feasibility as well would result in double-counting. As long as the Debtor can show it is able to make the debt payments its plan requires of it and will require no further financial reorganization, no additional debt cushion is required.

**66.** *See* Section II C above. The court notes that the Debtor has presented evidence that its plan may be feasible at rates closer to the rates this court considers appropriate and has asked the court to fix a rate. However, it is up to the Debtor to propose a Chapter 11 reorganization plan, not the court.

the court does not need additional proof of the Debtor's ability to make the balloon payment, because, on the evidence the Debtor has presented, it is clear that it will be able to fund a large part of the balloon from its operations if it is able to meet its projections.

■ In making its monthly cash payments, the Debtor will have paid off over $600,000 of principal on EquiVest's secured claim in the next ten years, even paying interest at a rate closer to that which this court considers appropriate. Thus, the balloon payment due in 2003 will be approximately $1.65 million. Even if the Cypress Creek property does not increase in value one nickel in the next ten years (a hypothetical result that ignores some inevitable inflation over a ten year period), the property will be worth approximately 1.35 times the remaining principal. Thus, it appears that the Debtor should be able to easily sell the property, or refinance it with a loan that would be about 65% loan to value.[67] Thus, this court believes that the balloon payment is feasible.[68] *See In re Manion*, 127 B.R. 887, 890 (Bankr.N.D.Fla.1991) (7 year balloon, 20 year amortization feasible because it would give debtors time to reestablish creditworthiness

to obtain new or rollover financing). *See also ROPT*, 152 B.R. at 410 (5 year balloon, 20 year amortization feasible); *but see In re M & S Assocs.*, 138 B.R. 845, 852 (Bankr. W.D.Tex.1992) (four year balloon not feasible); *In re Pelham Street Assocs.*, 134 B.R. 700, 701 (Bankr.D.R.I.1991) (5 year balloon, 25 year amortization not feasible); *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr.S.D.Tex.1989) (three year balloon not feasible).[69]

Nevertheless, the court holds that the Debtor's plan is not feasible for three reasons: (1) it fails to create a sufficient reserve for capital and tenant improvements; (2) it fails to create a working capital reserve; and (3) its debt service projections are unrealistically low.[70]

### E. Does Murphy's alleged prepetition misconduct bar him from managing the Debtor after confirmation?

EquiVest's final objection is that the Debtor's plan was not proposed in good faith and therefore cannot be confirmed under § 1129(a)(3). The basis of EquiVest's good faith objection is its allegation that Murphy, the Debtor's major equity owner and chief

---

**67.** The Debtor's projections show that the Debtor will have a cash balance of over $1.6 million by 2003. Because those projections are unrealistic in certain respects (outlined previously in this section), the actual cash balance at the time the balloon comes due will be lower than that projected by the Debtor. How much lower is impossible for this court to compute, but it is clear that the reorganized Debtor will not be able to pay the balloon solely from operations. However, the reorganized Debtor should have a significant amount of cash available to aid in a refinancing on reasonable terms.

It is worth noting that to get to the balloon payment, the reorganized Debtor would have to comply with the payment schedule imposed on it by the plan. Any such decade-long track record should make the reorganized Debtor an excellent candidate for refinancing.

**68.** This is true even though the balloon payment may require the sale of the property, for proposal of a liquidating plan is no bar to confirmation. 11 U.S.C. § 1129(a)(11); *ROPT*, 152 B.R. at 410.

**69.** Those courts that have found proposed plans calling for balloon payments unfeasible have almost always done so because the balloon pay-

ment was scheduled to come due in a relatively short time. The court's statement in *M & S Assocs.* is typical of the reasoning in these cases:

> "Confirmation of the Plan would merely allow the Debtor to postpone the inevitable, and to gamble, with the RTC's money, on the long shot possibility of a drastic improvement in the real estate market."
>
> *M & S Assocs.*, 138 B.R. at 852.

The instant plan suffers from no such weakness. It gives the reorganized Debtor a reasonable opportunity to establish itself as a viable candidate for refinancing.

**70.** At trial, Murphy promised to secure a personal line of credit to cure any deficiencies the court found in the plan or that arose in the execution of the plan. This court gives little weight to Murphy's promise. Absent evidence of Murphy's ability to obtain and use a personal line of credit to cure any deficiencies of the Debtor and incorporation of Murphy's promise into the plan, Murphy's promise is little more than a pipedream. As explained in Section II E below, Murphy's performance in managing SM 104 and in this Chapter 11 case leaves this court in a position to give little weight to any of Murphy's promises.

officer, engaged in gross misconduct in his prepetition management of the Debtor. The record in this proceeding is replete with evidence of Murphy's serious misconduct in his management of the business and fully substantiates EquiVest's allegations in that regard. While this misconduct is not relevant for purposes of § 1129(a)(3), it is highly relevant under § 1129(a)(5). Thus, this court holds that the continued employment of Murphy as an officer of the Debtor is prohibited by § 1129(a)(5).

(1) Murphy's prepetition misconduct.

EquiVest alleges that Murphy engaged in serious misconduct in at least three different aspects of his prepetition management of the Debtor. First, EquiVest claims that Murphy diverted rents he collected from the Debtor's tenants from the lockbox, in direct violation of two state court orders. Second, EquiVest says that Murphy is to blame for material misrepresentations made during the Debtor's abortive prepetition attempt to refinance its mortgage debt. Finally, EquiVest argues that Murphy set up an accounting system for the debtor that was grossly inadequate in that it was unable to account for large disbursements of funds and enabled Murphy to commingle the Debtor's assets with those of the other SM entities.

(a) Diversion of rents from lockbox.

In February 1990, the state court ordered the Debtor to deposit all rents it collected from its tenants directly into a lockbox account. Some six months later, in August 1990, Alfred Chambliss, then EquiVest's president, noticed that only $25,000 had been deposited into the lockbox for that month, instead of the usual $60,000. Chambliss, whose testimony the court finds to have been highly credible, said that when he brought the matter to Murphy's attention, Murphy told him that the Debtor's major tenant, Thasc, was withholding its rent payment because the roof was leaking.

Murphy's response to Chambliss was untrue. Check stubs produced by Thasc make it clear that Thasc did indeed pay the August 1990 rent. Murphy simply diverted the money in violation of the lockbox order and lied to Chambliss to cover up his misconduct.

Apparently, Murphy was not in the least deterred by Chambliss's inquiries with respect to the diverted rents. The record is clear that between September 1990 and June 18, 1992, the date of the Chapter 11 petition, Murphy received twenty-one rent checks from Thasc. Of those, only four found their way into the lockbox account. Seven were deposited in the Debtor's unrestricted account at Southeast Bank. Six were converted into cashier's checks. Four were deposited into the accounts of other SM entities. Murphy did not lack for temerity in these diversions, continuing them even after the March 1992 appointment of a special master to oversee the payment of expenses related to the Cypress Creek property. *Cf. United States v. Mitan,* 966 F.2d 1165, 1171 (7th Cir.1992). When called as a witness at the confirmation hearing, Murphy was unable to offer any credible explanation of what happened to the cashier's checks or why four checks were deposited into the account of other SM entities. Murphy's testimony at the confirmation hearing with respect to these and other irregularities was evasive and of limited credibility.

Beverly Backhoff, the Trustee's accountant, provided further credible information on the diversion of rental checks by the Debtor in violation of the state court lockbox orders. She testified that between August 1990 and December 1991, there were regular deposits of rentals collected by the Debtor into the Debtor's unrestricted account at Southeast Bank, which, of course, was precisely the result the lockbox orders were meant to avoid.

The consistent pattern of diversion of rents in violation of the state court lockbox orders by the Debtor under Murphy's control is further corroborated by a comparison done by Chambliss of the rent roll with the bank statements for both the lockbox account and the Debtor's unrestricted Southeast Bank account. That analysis shows that in the first six months of 1991 alone, $113,000 of rent checks collected by the Debtor did not find

their way into either the lockbox account or the Debtor's unrestricted account.

The testimony of Chambliss and Backhoff combined with the rent roll and bank accounts point an accusing finger at Murphy. Not only did Murphy take a substantial number of the Thasc rent payments and divert them into the Debtor's unrestricted bank account and the accounts of other affiliated SM entities in blatant violation of the state court lockbox orders, it is likely he also diverted checks from tenants other than Thasc as well.

The Debtor tries to shift the blame for the illegal diversions to EquiVest by contending, without documentary or credible testimonial support, that EquiVest knew about and acquiesced in the diversions. The Debtor claims that EquiVest looked the other way for a long period of time because the diverted rental payments were being used to maintain the Cypress Creek property.

There are several reasons why this explanation makes no sense. First, it is by no means clear that the diverted rental payments were in fact used to pay expenses for maintaining and improving the Cypress Creek property. Murphy could offer no rational explanation of what happened to the diverted rentals that were converted to cashier's checks or put in the accounts of other SM entities. Since he could not even explain or offer documentary evidence showing what happened to the money, there is no way he could tie the diversions to any particular expense incurred by the Debtor in maintaining, preserving or improving the Cypress Creek property.

Second, EquiVest did not in fact sit back and do nothing in the face of Murphy's diversion of rents collected by him. As early as August 1990, Chambliss was questioning Murphy about shortfalls in the lockbox account. Murphy simply lied to Chambliss about Thasc's withholding of rental payments until a roof leak was repaired. Later inquiries by EquiVest about shortfalls in the lockbox account met with equally false explanations that Thasc was having financial problems and was not paying rent to the Debtor.

Between April 1991 and May 1992, EquiVest notified Murphy nine times of the Debtor's default under the lockbox order. Each time, Murphy stonewalled EquiVest. Finally, EquiVest lost patience with Murphy and moved in the state court to have Murphy held in contempt for violation of the lockbox orders. On the morning the contempt motion was scheduled to be heard, Murphy filed a Chapter 11 petition for the Debtor. Thus, it is clear that EquiVest did not stand idly by while the Debtor was diverting rents in violation of the lockbox orders.

In fact, if, as the Debtor contends, EquiVest allowed rents to be diverted by the Debtor to the unrestricted accounts of itself and its affiliates, it would be sanctioning the exact same system that led it to initiate the litigation that produced the lockbox order. Murphy would have unfettered control of at least some of the rental payments. He could apply those payments to the Debtor's benefit or commingle those rents with the assets of the other SM entities he controlled. Inadequacy in the Debtor's accounting controls allowed him a free hand in disposing of the rents he diverted to meet the Debtor's expenses if he so chose or to divert them to other entities. In light of EquiVest's litigation against that system, it is hard to believe that it would snatch defeat from the jaws of victory by standing back after it obtained relief in the state court and allowing Murphy to continue to run the Debtor's business in a way EquiVest had already demonstrated was unacceptable to it.

Finally, even if Murphy's claim that EquiVest agreed to sit back and do nothing while he violated the lockbox orders is true, Murphy's diversion of rents would not be exonerated. Murphy was bound to follow the lockbox system by two state court orders. The record makes it clear that Murphy simply flaunted the state court orders as if they did not exist. He had no right to disobey those orders, even with EquiVest's consent, and even if every nickel of rent he diverted went to pay the Debtor's expenses. If the parties were no longer to be bound by the lockbox orders, the Debtor should have sought to have the state court vacate or amend those

orders. If, as Murphy contends, EquiVest agreed to his conduct in violating the orders, it would have been easy enough for the parties to seek joint relief from those orders. Murphy cannot put himself above the law. He, like anybody else, is bound to follow any court order until such time as he has fully complied with the order or he is granted relief from the order. His blatant disobedience of the orders with the weak excuse that EquiVest implied that it was permissible to do so cannot be condoned.

### (b) Riverside loan proposal.

In the spring of 1992, DM & R, an entity owned by Murphy, applied on behalf of the Debtor to Riverside Capital Advisors for a loan. The loan package was prepared by Fred Welker, a mortgage banker who was also the Debtor's interest rate expert in this proceeding. The application sought a loan in the amount of $2.5 million. The Debtor hoped to use the proceeds of the loan to pay off the existing EquiVest debt in full.

The loan application contained several material misrepresentations of crucial facts. First, the value placed on the Debtor's real estate by the loan application documents was intentionally overstated. The loan application claims that the Cypress Creek property had an appraised value of $6.7 million as of January 1987. That alleged value was clearly wrong. C & P valued the *entire fee* at $6.7 million, but only valued the Debtor's *leasehold interest* in the property at $4.93 million as of January 1987, and at $5.525 million at "stabilization,"[71] which C & P projected to occur in November 1987.

More importantly, the loan application failed to declare that Hume Real Estate Consultants had appraised the Cypress Creek property for EquiVest in December 1991, at $3.07 million. While Murphy's testimony was noncommittal as to whether he had received the Hume appraisal before the Riverside loan package was submitted, he did admit that he received it some time in the

spring of 1992. Murphy did not recall whether, after, he received the Hume appraisal, he forwarded it to Riverside. It does appear, however, that Riverside learned of the appraisal from EquiVest, not Murphy. As a result, on June 5, 1992, Riverside asked the Debtor for a letter agreeing that the value of the Cypress Creek property was $3.07 million.

The loan application also stated that the Cypress Creek building cost $6.4 million to build. That statement is clearly false. The Debtor's records make clear that the actual cost of the building was about $4 million. At the confirmation hearing, Murphy conceded that $4 million was an accurate statement of the cost of the Cypress Creek building.

Finally, the loan application estimated net operating income at approximately $384,000. That estimate is 26% higher than the estimate of net operating income of approximately $303,000 the Debtor received from its own appraiser, Fred Roe, in June 1992.

Murphy denies responsibility for these errors, blaming Welker for the shortcomings of the Riverside loan application. The court finds Murphy's attempts to escape responsibility for the shortcomings of the Riverside loan application to be disingenuous at best. It strains credibility to accept the notion that Murphy was not deeply involved in such a crucial transaction in the Debtor's attempts to survive as the Riverside loan application. However, if the court were to accept Murphy's claim that he did not review the loan package, that would be almost as troubling as the errors themselves. The loan application, if it produced a loan of $2.5 million at reasonable terms, could have kept the Debtor out of bankruptcy. If Murphy failed to review the loan application package despite its obvious importance, his conduct could only be construed as grossly negligent. Thus, even if the court did believe that Murphy had nothing to do with the loan submission package (which it does not), Murphy's conduct would be unacceptable.[72]

---

71. *See* n. 3 above.

72. The Debtor argues that the errors are irrelevant, in that there was "absolutely no harm generated" because Riverside *did not make the loan.*

That argument is without merit. The relevant fact is that the loan package was false and that Murphy either intentionally produced a fraudulent loan application or was grossly negligent in connection with its production.

The court concludes that the Debtor, under the direction of Murphy, deliberately made numerous material misrepresentations concerning the Debtor in the Riverside loan application package in an attempt to inflate the value of the Cypress Creek property and the Debtor's prospects to induce Riverside to make the loan on more favorable terms to the Debtor. Even if the false information in the loan application was produced by Welker, Murphy, as the Debtor's chief officer, had to know it was false. The Riverside loan application speaks volumes about Murphy's qualifications (or lack thereof) to manage the reorganized Debtor.

### (c) Accounting problems.

Under Murphy's prepetition management, the Debtor's accounting was in a state of disarray. At the time of the instant confirmation hearing on the Debtor's plan (March 1993), the Debtor had not yet closed its books for the 1991 calendar year. Because of this, 1992 monthly financial statements for the Debtor could not be prepared. The Debtor cannot find its 1990 general ledger, which would show all receipts and disbursements, and either confirm or deny some of the charges of misconduct EquiVest has levelled against Murphy. The Debtor's 1991 general ledger is not yet complete, and it is unable to produce a 1992 general ledger. In addition, the Debtor's cash receipts journal is inaccurate, and its accounting controls are virtually nonexistent. Furthermore, the Debtor has apparently failed to file its 1991 federal and state income tax returns.[73] The most damning confirmation of the gross inadequacy of the Debtor's financial records is the fact that, to this date, no one is able to determine what happened to $861,000 of the loan proceeds from the original June 1987 EquiVest loan to the Debtor.

The commingling of the Debtor's funds with other SM affiliates prior to the filing of the bankruptcy petition was another pervasive accounting problem that has to resolved. Murphy transferred significant amounts of money between the various affiliated SM entities and the Debtor, and did so on a regular basis.[74] Obviously, the commingling of the Debtor's funds with those of the other SM affiliates presents significant risks for the Debtor and its creditors. Several of the SM affiliates are in dire financial straits. The commingling of funds with the rest of the SM empire exposed the Debtor and its creditors to significant risks. If, for example, funds of the Debtor were deposited in SM 108's bank account, those funds might well have been lost when SM 108 filed bankruptcy. If SM 108 repaid the Debtor, the Debtor might well find itself defending an insider preference action by the SM 108 trustee.

The bottom line is clear. The chaotic condition of the Debtor's financial records and the loose commingling of the Debtor's funds with those of the other SM entities during Murphy's stewardship stand as clear and convincing evidence of Murphy's mismanagement of the Debtor and its affairs.

(2) Does Murphy's prepetition misconduct lead to the conclusion that the Debtor's plan was not filed in good faith?

Section 1129(a)(3) requires that a Chapter 11 plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). For confirmation purposes, the good faith requirement set out in § 1129(a)(3) is satisfied "when there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Madison Hotel Assocs.*, 749 F.2d 410, 424 (7th Cir.1984); *In re Mulberry Phosphates, Inc.*, 149 B.R. 702, 708 (Bankr.

73. The Debtor also failed to produce its 1991 and 1992 budgets, even though Murphy claims those budgets were prepared.

74. Murphy claimed that these transfers were not intermingling because the Debtor kept track of the transfers using something Murphy called "letters of direction," which were correspondence between the SM affiliates, prepared by Murphy and directing payment from one SM affiliate to another. The court finds that these letters of direction do not constitute anything approaching a viable accounting control. In fact, they are virtually incomprehensible and in no way justify Murphy's willingness to expose the Debtor and its creditors to significant risk for the benefit of the other entities he controlled.

M.D.Fla.1993); *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr.S.D.Cal.1982). Thus, good faith requires a legitimate and honest purpose to reorganize the debtor, coupled with a financial plan that has a reasonable probability of success. *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 649 (2d Cir.1988); *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir.1985); *Mulberry Phosphates*, 149 B.R. at 708.

■ In evaluating good faith, the bankruptcy court must look to the totality of the circumstances surrounding the development and proposal of the plan. *See Madison Hotel Assocs.*, 749 F.2d at 425; *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1160 (5th Cir.1988), *cert. denied,* 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 330 (1988). It is clear that a court may consider all *postpetition* conduct of the debtor relating to the development and proposal of the plan in evaluating good faith. The court may consider *prepetition* conduct of the debtor only if that conduct is relevant to show a desire on the part of the debtor to "use bankruptcy procedures to avoid paying a debt rather than for rehabilitation." *Matter of Smith,* 848 F.2d 813, 821 (7th Cir.1988) (interpreting same language for purposes of § 1325(a)(3)). *Compare also Matter of Fiesta Homes of Ga.,* 125 B.R. 321, 325 (Bankr.S.D.Ga.1990); (court may not consider prepetition conduct); *In re General Homes Corp.,* 134 B.R. 853, 862

(Bankr.S.D.Tex.1991); *with In re Elsinore Shore Assocs.,* 91 B.R. 238, 260 (Bankr. D.N.J.1988) (prepetition conduct relevant); *In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 149 (Bankr.S.D.N.Y.1984) (same). *See also* 11 U.S.C. § 1104(a)(1) (trustee may be appointed for a Chapter 11 debtor if current management guilty of fraud, dishonesty, incompetence or gross mismanagement prepetition or postpetition).

■ Here, EquiVest asks the court to find the Debtor's plan to be proposed in bad faith based almost entirely on prepetition misconduct by Murphy.[75] The court has already held that Murphy engaged in egregious misconduct by diverting rents from the lockbox account, misrepresenting material facts in seeking the Riverside loan, and creating a woefully inadequate accounting system. However, under § 1129(a)(3), this court should not consider prepetition misconduct, no matter how serious, unless it is relevant to show that the prepetition misconduct was directly related to the plan before the court for confirmation; that is, unless the prepetition misconduct is relevant to show that the plan was part of some scheme of the Debtor to avoid its debts. *See Smith,* 848 F.2d at 821. Murphy's prepetition mismanagement, as gross as it was, had no direct relationship to the proposal of the Debtor's plan now before the court. In fact, for all that appears in the record in this proceeding, the Debtor's plan was proposed in good faith, as that term is used in § 1129(a)(3).[76]

**75.** EquiVest makes two allegations relating to postpetition conduct of the Debtor. First, EquiVest contends that the Debtor's plan and disclosure statement conceal critical information by stating that "the Debtor does not believe that there are any voidable transfers." Such a statement by the Debtor is, however, consistent with its position at the time of the filing of the plan that Murphy in fact received no preferences. It is even more true now, since the preference claims have already been settled for approximately $73,000, without any admission of liability.

EquiVest also alleges that, after the filing of the petition and the appointment of a trustee, the Debtor diverted from the Trustee a cashiers' check in the amount of roughly $8,600 for past due rent from one of its tenants, Butler, into the account of SM Corporation, the Debtor's parent. The funds were eventually forwarded to the Trustee, but not until the morning of the Trustee's examination of Murphy some three months after the check was received by the Debtor. The

Debtor claims that Murphy turned the check over to the Debtor's attorney, Michael Feinman, shortly after he received it, and that personal and medical problems of Feinman prevented Feinman from forwarding the check to the Trustee. The court notes that Murphy's explanation of the circumstances surrounding the alleged diversion of the rent check postpetition was evasive and inconsistent. However, because Murphy's excuse is at least plausible and because EquiVest offered no direct evidence to contradict Murphy's explanation, the court does not believe a finding of bad faith under § 1129(a)(3) on this issue alone is warranted.

**76.** Murphy's prepetition misconduct would, of course, be relevant to the resolution of a motion to dismiss a petition for lack of good faith *in filing* under § 1112(b). *See Madison Hotel Assocs.,* 749 F.2d at 425; *In re Stolrow's, Inc.,* 84 B.R. 167, 171 (9th Cir.B.A.P.1988). This is especially true in light of the Eleventh Circuit's close scrutiny of good faith in filing of Chapter 11

Indeed, it appears that the true purpose of the plan now before the court for consideration is the Debtor's genuine desire to reorganize. Such a result is clearly consistent with the purposes and objectives of Chapter 11 of the Bankruptcy Code, since the primary goal of Chapter 11 is to promote the restructuring of troubled businesses. *See N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 759-60 (Bankr. S.D.N.Y.1992). *But see Toibb v. Radloff*, — U.S. ——, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) (nonbusiness debtor can file petition under Chapter 11). Thus, the court holds that the Debtor's plan has been proposed in good faith.

(3) Is Murphy's prepetition misconduct to be considered at all by the court in determining whether to confirm the Debtor's proposed plan?

 While Murphy's prepetition misconduct is not relevant under § 1129(a)(3), it is relevant under § 1129(a)(5). That section provides, in pertinent part, that a plan may be confirmed only if the service of any director or officer of the reorganized debtor or any successor to the debtor "is consistent with the interests of creditors and equity security holders and with public policy." 11 U.S.C. § 1129(a)(5). Where the proposed officer or director has previously engaged in serious misconduct in managing the debtor or is unfit to manage the debtor, employment is improper under § 1129(a)(5). *Cf. Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939) (insiders cannot manipulate the bankruptcy process for their benefit to the detriment of creditors); *Taylor v. Standard*

Gas & Electric Co., 306 U.S. 307, 323-24, 59 S.Ct. 543, 550-551, 83 L.Ed. 669 (1939) (refusing to allow previous majority shareholder a majority position in the new debtor in a reorganization under § 77B of the Bankruptcy Act because of "abuses of management"). *See also In re Consolidation Coal Co.*, 11 F.Supp. 594 (D.Md.1935), *appeal dismissed,* 79 F.2d 989 (4th Cir.1935); 5 *Collier on Bankruptcy* ¶ 1129.02, at 1129-34 (1992). Section 1129(a) obligates this court to make a finding under § 1129(a)(5), whether or not any party has objected to the plan on § 1129(a)(5) grounds.[77] *See* 11 U.S.C. § 1129(a) (court "shall confirm a plan only if all of the following requirements are met").

In this case, the Debtor's plan proposes to reinstate the prepetition management structure of the Debtor. Thus, if the Debtor's plan were confirmed, Murphy once again would be put in full control of the Debtor, due to his ownership and control of SM Corporation, the Debtor's parent, and DM & R, the Debtor's management company. In light of Murphy's prepetition misconduct, this court views such a result as unacceptable. Murphy intentionally diverted funds from a lockbox, in complete disregard of two state court orders. Therefore, this court cannot be satisfied that Murphy will comply with any order entered by this court. Murphy is also responsible for serious misrepresentations in the Debtor's loan application to Riverside. He also made serious misrepresentations to EquiVest with respect to his chronic diversions of rents from the state court-ordered lockbox. Therefore, the court cannot be satisfied that Murphy will be truthful in his dealings with creditors. Furthermore, the accounting system used by

petitions in single asset real estate cases. *See In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir.1988); *In re Natural Land Corp.*, 825 F.2d 296 (11th Cir.1987); *In re Albany Partners, Ltd.*, 749 F.2d 670 (11th Cir.1984). Most of the cases EquiVest cited in support of its § 1129(a)(3) objection are actually § 1112 dismissal cases. *See, e.g., In re Kerr*, 908 F.2d 400 (8th Cir.1990), *In re Cloisters of Brevard, Inc.*, 117 B.R. 722 (Bankr. M.D.Fla.1990), *In re Sal Caruso Cheese, Inc.*, 107 B.R. 808 (Bankr.N.D.N.Y.1989), *In re Tim Wargo & Sons, Inc.*, 107 B.R. 622 (Bankr.E.D.Ark. 1989), *In re Hartford Run Apartments of Buford,*

*Ltd.*, 102 B.R. 130 (Bankr.S.D.Ohio 1989), and *In re Brauer*, 80 B.R. 903 (N.D.Ill.1987). There is, however, a sharp distinction between bad faith in filing a petition and bad faith in filing a plan.

EquiVest is not pursuing a bad faith objection in the current proceeding.

77. EquiVest has not objected to the confirmation of the Debtor's proposed plan under § 1129(a)(5).

**246**

Murphy to manage the Debtor, combined with his regular commingling of funds among the SM affiliates, was inexcusable and exposed the Debtor's creditors to significant risks. In view of his egregious misconduct, this court cannot approve Murphy's control of the affairs of the reorganized Debtor. The record makes it clear that Murphy is not qualified to manage the reorganized Debtor, both in terms of competence and honesty. Continued employment of Murphy would clearly be inconsistent with the interests of the Debtor's creditors and with public policy. Thus, the Debtor's plan must be denied confirmation under § 1129(a)(5).

### CONCLUSION

For the reasons stated in this opinion, the court denies confirmation of the Debtor's plan of reorganization. The plan's separate classification of EquiVest's unsecured deficiency claim from the claims of the general unsecured creditors, and the purchase by the old equity owners of the equity interests in the reorganized Debtor for new value are permissible. However, the plan is not fair and equitable to EquiVest, for it does not pay EquiVest an appropriate interest rate. In addition, the Debtor has failed to show by a preponderance of the evidence that the plan is feasible. Finally, the plan violates § 1129(a)(5), in that it allows Murphy to be employed as the chief officer of the Debtor.